# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 19, 2018        Decided August 3, 2018

No. 17-1040

OLD DOMINION ELECTRIC COOPERATIVE,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

LSP TRANSMISSION HOLDINGS, LLC, ET AL.,
INTERVENORS

Consolidated with 17-1041

On Petitions for Review of Orders of
the Federal Energy Regulatory Commission

*Jonathan S. Franklin* argued the cause for petitioners. With him on the briefs were *Michael A. Yuffee*, *Adrienne E. Clair*, and *Rebecca L. Shelton*.

*Larisa M. Vaysman* and *Michael R. Engleman* were on the brief for intervenors LSP Transmission Holdings, LLC, et al. in support of petitioners.

*Lona T. Perry*, Deputy Solicitor, Federal Energy Regulatory Commission, argued the cause for respondent. With her on the brief was *Robert H. Solomon*, Solicitor.

*Morgan Parke*, *Stacey L. Burbure*, *Kenneth G. Jaffe*, *Neil H. Butterklee*, *Gary E. Guy*, *Amanda Riggs Conner*, *Randall V. Griffin*, *Richard P. Bress*, *David L. Schwartz*, *Vilna Waldron Gaston*, and *Sandra E. Rizzo* were on the brief for intervenors FirstEnergy Companies, et al. in support of respondent. *Kenneth R. Carretta* and *Elias G. Farrah* entered appearances.

Before: HENDERSON, KAVANAUGH,[*] and KATSAS, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* KATSAS.

KATSAS, *Circuit Judge*: In the past, electric utilities in the mid-Atlantic region have shared the costs of high-voltage transmission lines, which benefit the entire region. In 2015, some of these utilities proposed to eliminate cost sharing for projects undertaken only to satisfy an individual utility's planning criteria, including projects that involve high-voltage lines. The Federal Energy Regulatory Commission approved this change and applied it to deny cost sharing for projects to rebuild two high-voltage lines. The petitioners, whose local zone now must bear the entire cost of these two projects, contend that FERC's decisions were unlawful or inadequately explained.

---

[*] Judge Kavanaugh was a member of the panel when this case was argued but did not participate in the opinion.

3

I

A

The Federal Power Act gives FERC jurisdiction over facilities that transmit electricity in interstate commerce. *See* 16 U.S.C. § 824(b)(1); 42 U.S.C. § 7172(a)(1)(B). Under the Act, electric utilities must charge "just and reasonable" rates. 16 U.S.C. § 824d(a). For decades, the Commission and the courts have understood this requirement to incorporate a "cost-causation principle"—the rates charged for electricity should reflect the costs of providing it. *See Ala. Elec. Co-op., Inc. v. FERC*, 684 F.2d 20, 27 (D.C. Cir. 1982). We often frame this principle as one that ensures "burden is matched with benefit," so that FERC "generally may not single out a party for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014); *see Midwest ISO Transmission Owners v. FERC*, 373 F.3d 1361, 1368–69 (D.C. Cir. 2004). This cost-causation principle "add[s] flesh to [the] bare statutory bones" of the just-and-reasonable-rate requirement. *K N Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992).

To promote more efficient coordination among electric utilities, FERC has promulgated a regulation known as "Order No. 1000." Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 136 FERC ¶ 61,051 (2011). It imposes two requirements relevant here. First, utilities in each planning region must jointly produce a regional transmission plan to determine what new facilities would best meet regional needs for electricity. *Id.* P 148. Second, in their respective tariffs, utilities must include a formula "for allocating the costs of new transmission facilities selected in the regional transmission plan for purposes

of cost allocation." *Id.* P 558. This formula must satisfy six general principles, the first of which is the cost-causation principle: "The cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits." *Id.* P 622. Order No. 1000 requires each utility to show, through compliance filings, that its cost-allocation formula is consistent with the six specified principles. *Id.* P 603.

This case involves disputes within a planning region encompassing much of the Mid-Atlantic and part of the Midwest. In this region, the transmission of electricity is overseen by PJM Interconnection, LLC, which controls but does not own the facilities of its member utilities. ("PJM" refers to *P*ennsylvania, New *J*ersey, and *M*aryland—the first three states in which PJM operated.) The region is subdivided into zones that correspond to areas served by each individual utility. The utilities are governed by the PJM Operating Agreement, which sets forth the respective rights and duties of PJM and its members, and the PJM Open Access Transmission Tariff, which details the terms on which the utilities provide service.

To comply with the regional-planning requirement of Order No. 1000, PJM-member utilities maintain a Regional Transmission Expansion Plan. Schedule 6 of the Operating Agreement specifies what kind of projects must be included in this Regional Plan. As relevant here, Schedule 6 designates three categories of projects for inclusion in the Plan: (1) projects to satisfy PJM's own planning and reliability criteria; (2) projects to satisfy reliability criteria developed by standard-setting organizations such as the North American Electric Reliability Corporation ("NERC"); and (3) projects to satisfy planning criteria established by individual utilities. The

utilities submit their individual planning criteria both to FERC, on a document called Form 715, and to PJM.

Schedule 12 of the Tariff addresses the cost-sharing requirements of Order No. 1000. Before 2015, Schedule 12 required regional cost sharing for all "Regional Facilities," which it defined as projects that were (a) included in the Regional Plan to satisfy any of the planning criteria described above and (b) particular kinds of high-voltage projects. Schedule 12 also establishes the cost-allocation formula for such Regional Facilities. Half of these costs are allocated on a pro rata basis, based on the level of customer demand within each zone, regardless of where the specific project at issue is located. This method of cost allocation is called the "postage stamp" approach. The remaining costs are allocated based on an estimate of which zones most directly benefit from the project at issue, as made under what is called a "distribution factor ('DFAX') analysis." In contrast, the costs of lower-voltage facilities, which generally do not qualify as "Regional Facilities," are allocated solely under a DFAX analysis.

As required by Order No. 1000, PJM submitted this cost-allocation methodology to FERC, which approved it in March 2013. *PJM Interconnection, LLC*, 142 FERC ¶ 61,214, PP 412–26 (2013) ("PJM Compliance Order"). In so doing, FERC specifically found that "high-voltage transmission facilities have significant regional benefits that accrue to all members of the PJM transmission system." *Id.* P 413. Further, it found that the proposed hybrid cost-allocation method for high-voltage facilities, incorporating both postage-stamp and DFAX components, would satisfy the cost-causation principle "that costs be allocated in a manner that is roughly commensurate with benefits received." *Id.* According to FERC, the postage-stamp component "capture[d] the full spectrum of benefits associated with high-voltage facilities,

including difficult to quantify regional benefits, such as improved reliability, reduced congestion, reduced power losses, greater carrying capacity, reduced operating reserve requirements, and improved access to generation." *Id.* P 414.

## B

Petitioners are three Virginia-based members of PJM—Old Dominion Electric Cooperative, Dominion Energy Services, Inc., and Virginia Electric & Power Co. d/b/a Dominion Energy Virginia (collectively "Dominion"). In July 2013, Dominion proposed to rebuild an aging high-voltage transmission line between Elmont and Cunningham, Virginia. The project initially did not qualify for cost sharing because it was unnecessary to satisfy the extant planning and reliability criteria of PJM, NERC, or Dominion.

In September 2014, Dominion adopted its own "end of life" planning criteria, submitted the criteria on Form 715 to FERC, and presented them to a PJM planning committee. Dominion concluded that replacing the Elmont-Cunningham line was necessary to satisfy these new criteria. PJM reviewed the project and agreed.

In March 2015, PJM initiated the first of three proceedings at issue here—the "Elmont-Cunningham Proceeding"—by filing with FERC proposed cost allocations for the Elmont-Cunningham project. Under Schedule 12's hybrid methodology for high-voltage facilities, nearly half of the costs would be allocated to Dominion; the remaining costs would be spread among 23 other utilities, with shares ranging from roughly 8% to 0.1%. Dayton Power and Light Co., an Ohio-based utility, intervened in the proceeding and objected. Dayton, which would be responsible for roughly 1% of the costs, complained that Dominion had unilaterally imposed costs on other utilities by adopting new end-of-life criteria.

Six days after PJM initiated the Elmont-Cunningham Proceeding, a group of member utilities opposed to the proposed cost sharing initiated the second proceeding at issue—the "Cost-Allocation Proceeding." The utilities proposed to amend Schedule 12 of the Tariff to prohibit cost sharing for any project included in the Regional Plan only to satisfy individual utilities' planning criteria. Under the proposed amendment, all costs for such projects would be "allocate[d] … to the local zone of the transmission owner that filed the planning criteria," regardless of whether the project produced regional benefits. J.A. 55. Dominion opposed the amendment as inconsistent with the cost-causation principle.

FERC initially rejected the utilities' proposed amendment on two grounds. In part, FERC concluded that the amendment violated Order No. 1000 by creating a category of projects selected for cost allocation but not subject to the approved cost-allocation formula. *See PJM Interconnection, LLC*, 151 FERC ¶ 61,172, P 22 (2015). FERC also concluded that the amendment was inconsistent with its earlier finding that high-voltage transmission lines provide "significant regional benefits that accrue to all members of the PJM transmission system." *Id.* P 23.

Meanwhile, in the Elmont-Cunningham Proceeding, FERC ordered a technical conference to address how PJM satisfies its regional-planning obligations under Order No. 1000. *PJM Interconnection, LLC*, 152 FERC ¶ 61,197 (2015). In that order, FERC rejected Dayton's process-based argument against the proposed cost sharing. Specifically, FERC found that "Dominion followed the appropriate procedures to update its local planning criteria," by presenting them both to the PJM planning committee and to FERC. *Id.* P 15.

After the technical conference, FERC reversed course and accepted the tariff amendment. *PJM Interconnection, LLC*, 154 FERC ¶ 61,096 (2016) ("Cost-Allocation Order"). First, FERC concluded that the amendment did not violate Order No. 1000 because "not all projects included in the [Regional Plan] are selected for purposes of cost allocation," and so the amendment merely created a "new category of projects" included in the Regional Plan but not selected for cost allocation. *Id.* P 13 & n.16. FERC further reasoned that projects included in the Regional Plan only to satisfy individual utilities' planning criteria "are not needed to meet PJM regional criteria or NERC reliability standards," but instead are included "only to ensure that such projects are developed in a manner that is consistent with" the Regional Plan. *Id.* P 13. FERC also found that the proposal would not undermine the competitive-bidding process because only projects "located solely within a transmission owner's zone" and having their costs "allocated solely to that zone" would be restricted from competitive bidding. *Id.* P 14. Finally, FERC held that the amendment did not produce an unjust and unreasonable allocation of costs because, of the 303 projects previously included in the Regional Plan to address only individual utilities' planning criteria, 98% of them had all of their costs allocated to the local zone. *Id.* P 16.

On the same day, FERC rejected PJM's proposed cost allocation for the Elmont-Cunningham project. *PJM Interconnection, LLC*, 154 FERC ¶ 61,097 (2016) ("Elmont-Cunningham Order"). FERC found that the project "must go into service within three years or less in order to avoid several regional Reliability Criteria violations, and PJM followed the stakeholder process outlined in its Operating Agreement." *Id.* P 27. But FERC rejected regional cost sharing as inconsistent with the tariff amendment that it had simultaneously approved in its Cost-Allocation Order. *Id.* P 28.

Commissioner LaFleur dissented in part from both orders. In the Cost-Allocation Proceeding, she would have narrowed the amendment to "preserv[e] the current regional cost allocation for certain high voltage projects, even if those projects are selected solely to address local planning criteria." Cost-Allocation Order, 154 FERC ¶ 61,096 (LaFleur, Comm'r, dissenting in part). She reasoned that FERC's prior compliance finding—"high-voltage transmission facilities have significant regional benefits that accrue to all members of the PJM transmission system"—did not depend on the type of planning criteria underlying the particular project at issue. *See id.* (quoting PJM Compliance Order, 142 FERC ¶ 61,214, P 413). Moreover, although the "overwhelming majority of projects approved to address local planning criteria" produced only local benefits, they were "lower voltage facilities" for which costs had never been regionally shared. *Id.* For the same reasons, Commissioner LaFleur also dissented from the rejection of cost sharing for the Elmont-Cunningham line. *See* Elmont-Cunningham Order, 154 FERC ¶ 61,097 (LaFleur, Comm'r, dissenting in part).

Before FERC issued these decisions, PJM had initiated the third and final proceeding at issue—the "Cunningham-Dooms Proceeding." It involved Dominion's proposal to rebuild a high-voltage line from Cunningham to Dooms, Virginia, as required by Dominion's end-of-life criteria. In July 2016, FERC applied its Cost-Allocation Order to reject PJM's proposed cost allocation, once again over Commissioner LaFleur's dissent. *See PJM Interconnection, LLC*, 156 FERC ¶ 61,030 (2016).

After unsuccessfully seeking rehearing of the three orders, Dominion timely sought judicial review in this Court.

II

Before addressing Dominion's challenge to FERC's decision to accept the tariff amendment, we must first determine what the amendment says and how it operates. On that question, Intervenors LSP Transmission Holdings, LLC and Northeast Transmission Development, LLC contend that the amendment, properly construed, violates Order No. 1000 by refusing to apply the approved cost-allocation formula to projects selected for cost allocation. FERC initially adopted this argument, 151 FERC ¶ 61,172, P 22, but later rejected it, 154 FERC ¶ 61,096, P 13.

FERC contends that we should not address an argument raised only by intervenors. As a general matter, an intervenor "may join only on a matter that has been brought before the court by a petitioner." *E. Ky. Power Co-op., Inc. v. FERC*, 489 F.3d 1299, 1305 (D.C. Cir. 2007) (quotation marks omitted). But the intervenors here challenge the same tariff amendment as does Dominion, and their argument under Order No. 1000 is closely related to Dominion's argument under the cost-causation principle. Moreover, the intervenors' argument turns on the proper construction of the amendment—a question antecedent to determining whether FERC permissibly approved it.

The amendment requires the costs of projects included in the Regional Plan to satisfy only Form 715 planning criteria to be allocated entirely to the zone of the utility that filed the criteria, "[n]otwithstanding" other provisions of Schedule 12. Tariff, Schedule 12(xv) (J.A. 72). The intervenors contend that the "notwithstanding" proviso should be read to apply only after a project has been deemed a Regional Facility, and therefore selected in the Regional Plan for cost sharing. Under that interpretation, the amendment would violate Order No.

1000, which requires utilities to have in place "a regional cost allocation method for any transmission facility selected in a regional transmission plan for purposes of cost allocation." 136 FERC ¶ 61,051, P 690.

FERC ultimately concluded that the amendment creates a category of projects included in the Regional Plan but not selected for cost sharing. *See* Cost-Allocation Order, 154 FERC ¶ 61,096, P 13. We agree. In denoting which facilities are to be selected for cost sharing, Schedule 12 distinguishes between "Required Transmission Enhancements," which are included in the Regional Plan, and "Regional Facilities" selected for cost sharing. *See* Tariff, Schedule 12(b)(i) (J.A. 58–59). The amendment qualifies this scheme by stating that some "Required Transmission Enhancements"—those included in the Regional Plan to satisfy only individual utilities' planning criteria—do not qualify for cost sharing. *See* Tariff, Schedule 12(b)(xv) (J.A. 71–72). Because the amendment applies to "Required Transmission Enhancements," which are not necessarily selected for cost sharing, it does not create a category of facilities selected for cost sharing but exempted from the approved cost-sharing formula.

Although we reject the intervenors' proposed construction of the amendment, their argument does highlight something unusual about Order No. 1000—it requires a pre-approved formula for projects "selected" by member utilities for regional cost sharing, and it requires the formula to be consistent with the cost-causation principle, but it appears largely silent on which projects may or must be selected for cost sharing. We elaborate on that point below.

III

Dominion contends that FERC arbitrarily violated the cost-causation principle by accepting the tariff amendment and applying it to prevent any cost sharing for the two high-voltage projects at issue here.  As noted above, the cost-causation principle requires "comparing the costs assessed against a party to the burdens imposed or benefits drawn by that party." *Midwest ISO Transmission Owners*, 373 F.3d at 1368.

Under the arbitrary-and-capricious standard of review, we uphold FERC decisions if the agency has "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made."  *FERC v. Elec. Power Supply Ass'n*, 136 S. Ct. 760, 782 (2016) (alterations adopted) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). Because this standard is deferential, we do not require FERC, in applying the cost-causation principle, to "utilize a particular formula," *Ala. Elec. Co-op.*, 684 F.2d at 27, or to "allocate costs with exacting precision," *Midwest ISO Transmission Owners*, 373 F.3d at 1369.  However, we have set aside orders when FERC's allocation of costs was either unreasonable, *see Pac. Gas & Elec. Co. v. FERC*, 373 F.3d 1315, 1322 (D.C. Cir. 2004), or inadequately explained, *see Sithe/Indep. Power Partners v. FERC*, 285 F.3d 1, 4–5 (D.C. Cir. 2002).  So too have other reviewing courts.  *See*, *e.g.*, *Ill. Commerce Comm'n v. FERC*, 756 F.3d 556, 565 (7th Cir. 2014); *Ill. Commerce Comm'n v. FERC*, 576 F.3d 470, 477–78 (7th Cir. 2009).

A

Application of the cost-causation principle is simple here, because this critical point is undisputed: high-voltage power lines produce significant regional benefits within the PJM

network, yet the amendment categorically prohibits any cost sharing for high-voltage projects like those at issue here.

In the various proceedings below, no party challenged, and FERC did not disavow, any of its findings in the PJM Compliance Order. There, in approving the original Tariff, the Commission found that "high-voltage transmission facilities have significant regional benefits that accrue to all members of the PJM transmission system." 142 FERC ¶ 61,214, P 413. According to FERC, these benefits include "improved reliability, reduced congestion, reduced power losses, greater carrying capacity, reduced operating reserve requirements, and improved access to generation." *Id.* P 414. FERC invoked these benefits in concluding that the postage-stamp component of the original cost-sharing formula—weighted at 50%— appropriately captured the "widespread, although difficult to quantify benefits" of high-voltage facilities. *Id.* P 413. And it held that Schedule 12's original cost-allocation formula was therefore consistent with the cost-causation principle. *See id.*

Historically, FERC has pressed this view even farther. For years prior to Order No. 1000, FERC took the position that the cost of high-voltage transmission lines within PJM should be shared based *entirely* on the postage-stamp method, on the theory that "everyone benefits from high-capacity transmission facilities because they increase the reliability of the entire network." *Ill. Commerce Comm'n*, 576 F.3d at 474. The Seventh Circuit twice set aside that position as going too far, *see id.* at 476–78; *Ill. Commerce Comm'n*, 756 F.3d at 565, but nothing in those decisions casts doubt on the unchallenged, narrower findings in the PJM Compliance Order.

Given the significant regional benefits of high-voltage transmission lines, FERC's decision to approve the amendment was arbitrary. As explained above, the amendment denies cost

sharing for *all* projects included in the Regional Plan only to satisfy the planning criteria of individual utilities—*including* for high-voltage lines. The amendment thus produces a severe misallocation of the costs of such projects. Here, for example, under the methodology previously endorsed by FERC as fairly matching costs to benefits, Dominion was estimated to enjoy only about 47% of the benefits from the Elmont-Cunningham project, and 43% of the benefits from the Cunningham-Dooms project. Yet, under FERC's orders approving and applying the amendment, Dominion would have to pay all of the costs of both projects. This does not amount to a quibble about "exacting precision," *Midwest ISO Transmission Owners*, 373 F.3d at 1369, or a tempering of the cost-causation principle in pursuit of "competing goals," *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 88 (D.C. Cir. 2014). Rather, it involves a wholesale departure from the cost-causation principle, which would "shift a grossly disproportionate share of [the] costs" of these high-voltage projects into a single zone. *Ill. Commerce Comm'n*, 756 F.3d at 565.

B

In the administrative proceedings, FERC did not attempt to justify its orders as a lawful departure from the cost-causation principle. Instead, FERC asserted three possible grounds for reconciling its orders with that principle. None of them is persuasive.

First, FERC noted that, of the 303 projects previously included in the Regional Plan based only on individual utilities' planning criteria, 98% of them produced only local benefits. Therefore, FERC reasoned, allocating all of the costs of these projects to the local utility at least roughly matched costs to benefits. *See* Cost-Allocation Order, 154 FERC ¶ 61,096, P 16.

FERC's statistics misleadingly aggregate two very different categories of projects. As Commissioner LaFleur explained, the 98% of projects that produced no regional benefits involved *low*-voltage facilities. *See* Cost-Allocation Order, 154 FERC ¶ 61,096 (LaFleur, Comm'r, dissenting in part). Moreover, the Tariff had always allocated costs for these projects under the DFAX method, which resulted in all costs being allocated locally. *See* Tariff, Schedule 12(b)(ii)(A) (J.A. 60–61). So, there never was any cost sharing for the 98% of owner-criteria projects that are low-voltage facilities. Rather, the entire purpose and effect of the amendment was to eliminate cost sharing for the *other* 2% of projects—which involve *high*-voltage facilities that FERC has recognized produce *significant* regional benefits.

Of course, a regulator need not always carve out exceptions for arguably distinct subcategories of projects. But here, it is undisputed that high-voltage and low-voltage projects are significantly different with regard to which utilities benefit from them. Moreover, FERC itself has long recognized these differences in making appropriate cost allocations— including for PJM. *See*, *e.g.*, PJM Compliance Order, 142 FERC ¶ 61,214, PP 413–17; *Ill. Commerce Comm'n*, 576 F.3d at 474–76. Thus, FERC could hardly say that trying to distinguish between high- and low-voltage facilities was not worth the trouble. Nor did FERC express any concern that Schedule 12, as originally approved, had proven inaccurate, administratively unwieldy, or otherwise problematic in distinguishing the two kinds of facilities. Rather, FERC's reasoning would replace a cost-allocation formula *about which FERC had expressed no concerns* with another one that is less accurate overall, as well as grossly inaccurate with respect to high-voltage projects, *in return for no countervailing regulatory benefit*.

In a variation on this theme, FERC invokes the cost-allocation regime for another planning region in the Midwest. *See Midwest Indep. Transmission Sys. Operator, Inc.*, 142 FERC ¶ 61,215 (2013) ("MISO"), *aff'd*, *MISO Transmission Owners v. FERC*, 819 F.3d 329 (7th Cir. 2016). In that region, 80% of the projects at issue historically had at least 75% of their costs allocated locally. *Id.* P 487. FERC then approved allocating all of these costs locally, and it concluded that the revised cost allocation was "roughly commensurate with the benefits." *Id.* P 518. FERC asserts that our case is even more straightforward, because 98% of the projects at issue had 100% of their costs allocated locally.

Again, however, FERC combines dissimilar categories of projects. As explained above, the 98% of projects highlighted by FERC are low-voltage ones with no regional benefits, whereas the 2% of projects targeted by the amendment are high-voltage ones conceded by FERC to have significant regional benefits. Moreover, the MISO order was supported by a finding that the benefits of the projects at issue there were "realized primarily in the pricing zone in which the project is located." 142 FERC ¶ 61,215, P 520. Here, by contrast, FERC's only relevant finding was that the projects impacted by the amendment produced "significant regional benefits." PJM Compliance Order, 142 FERC ¶ 61,214, P 413. In short, for purposes of cost causation, the local "baseline reliability projects" at issue in MISO are unlike the regional high-voltage facilities at issue here. *See Midwest ISO Transmission Owners*, 819 F.3d at 335 ("Baseline reliability projects differ from multi-value projects, which are larger, have a regional focus, and benefit from regional cost sharing.").

Second, FERC reasoned that projects included in the Regional Plan to satisfy only individual utilities' planning criteria "are not needed to meet PJM regional criteria or NERC

reliability standards." Cost-Allocation Order, 154 FERC ¶ 61,096, P 13. That is true, but the cost-causation principle focuses on project benefits, not on how particular planning criteria were developed. *See*, *e.g.*, *S.C. Pub. Serv. Auth.*, 762 F.3d at 87; *Midwest ISO Transmission Owners*, 373 F.3d at 1368; *K N Energy*, 968 F.2d at 1300. Moreover, Form 715 is not limited to projects with purely local benefits. To the contrary, it implements Section 213(b) of the Federal Power Act, which requires utilities to inform FERC of all "potentially available transmission capacity and known constraints." 16 U.S.C. § 824*l*(b). In addition, under FERC regulations, utilities must submit "a detailed description of the transmission planning reliability criteria used to evaluate system performance." New Reporting Requirement Implementing Section 213(b) of the Federal Power Act, 58 Fed. Reg. 52,420, 52,421 (Oct. 8, 1993); *see* 18 C.F.R. § 141.300(a). Neither the statute nor the implementing regulation limits reportable criteria to those involving projects with only local benefits.

Finally, FERC appears to claim affirmative support from its conclusion that the amendment is consistent with Order No. 1000. *See* Cost-Allocation Order, 154 FERC ¶ 61,096, P 13 & n.16. As explained above, Order No. 1000 requires cost-sharing only for projects "selected in a regional plan for purposes of cost allocation," 136 FERC ¶ 61,051, P 539, and the amendment effectively prevented the two projects at issue from being selected. However, compliance with Order No. 1000 does not necessarily ensure compliance with the cost-causation principle—a pre-existing, more general rule that, in order to ensure just and reasonable rates, FERC must make some reasonable effort to match costs to benefits. *See*, *e.g.*, *BNP Paribas Energy*, 743 F.3d at 268. Indeed, Order No. 1000 itself recognized the cost-causation principle as a pre-existing and generally applicable rule. *See* 136 FERC ¶ 61,051, P 504. As explained above, we fail to see how a categorical refusal to

18

permit any regional cost sharing for an important category of projects conceded to produce significant regional benefits can be reconciled with the background principle.  To the contrary, the cost-causation principle prevents regionally beneficial projects from being arbitrarily excluded from cost sharing—a necessary corollary to ensuring that the costs of such projects are allocated commensurate with their benefits.

IV

We are sensitive to the concern, pressed by Dayton and the other *amici* supporting FERC, that individual utilities should not have free rein to impose unjustified costs on an entire region by unilaterally adopting overly ambitious planning criteria.  However, nothing we say here prevents PJM or its member utilities from amending the Tariff, the Operating Agreement, or PJM's own planning criteria to address any problem of prodigal spending, to establish appropriate end-of-life planning criteria, or otherwise to limit regional cost sharing—as long as any amendment respects the cost-causation principle.  Indeed, the cost-causation principle, by allocating project costs consistent with project benefits, creates the best incentives for PJM member utilities themselves to agree on when to invest their scarce resources in transmission improvements.  Likewise, nothing we say prevents FERC from trimming excessive spending in the course of exercising its overarching mandate to ensure just and reasonable rates.  *See* 16 U.S.C. § 824d(a).  Nor do we limit the ability of PJM or FERC to assess whether individual projects are in fact appropriate under the governing planning or reliability criteria.  Finally, nothing we say constrains PJM's or FERC's ability to require competitive-bidding processes for regionally beneficial projects.

Instead, we hold only that FERC did not adequately justify its approval of the amendment at issue here, which prohibited cost sharing for a category of high-voltage projects conceded to have significant regional benefits, and which did so only because those projects reflected the planning criteria of individual utilities. The legal or economic merit of Dominion's particular end-of-life planning criteria, and the appropriateness of the Elmont-Cunningham and Cunningham-Dooms projects under those criteria, remain open issues on remand.

\* \* \* \*

The Commission acted arbitrarily and capriciously in approving the tariff amendment and applying it to the Elmont-Cunningham and Cunningham-Dooms projects. We therefore grant the petitions for review, set aside the orders under review to the extent that they approved the amendment and applied it to the two projects, and remand for further proceedings consistent with this opinion.

*So ordered.*