# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

―――――

Argued November 8, 2021        Decided July 15, 2022

No. 20-1262

ENTERGY ARKANSAS, LLC, ET AL.,
PETITIONERS

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

MISSISSIPPI PUBLIC SERVICE COMMISSION, ET AL.,
INTERVENORS

―――――

Consolidated with 20-1391

―――――

On Petitions for Review of Orders of the
Federal Energy Regulatory Commission

―――――

*Jennifer S. Amerkhail* argued the cause and filed the briefs for petitioners. *Zachary C. Schauf* entered an appearance.

*Carol J. Banta*, Attorney, Federal Energy Regulatory Commission, argued the cause for

respondent. With her on the brief were *Matthew R. Christiansen*, General Counsel, and *Robert H. Solomon*, Solicitor.

Before: ROGERS and WILKINS, *Circuit Judges*, and SILBERMAN, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* WILKINS.

WILKINS, *Circuit Judge*. The instant petition arises from a three-year effort to establish a cost allocation method for allocating Midcontinent Independent System Operator, Inc.'s ("MISO") share of costs for interregional transmission projects connecting a region operated by MISO and an adjacent region operated by PJM Interconnection, L.L.C. ("PJM"). In 2016, the Federal Energy Regulatory Commission ("FERC" or "Commission") required MISO to institute reforms to its interregional planning process and directed MISO to propose a cost allocation method for its share of certain interregional project costs. Since that time, MISO has twice submitted proposals for such cost allocation. Both times, FERC rejected the proposals, finding that they were not just and reasonable as required by the Federal Power Act (the "Act"), 16 U.S.C. §§ 791 *et seq.*, because they were inconsistent with the cost causation principle. After the second rejection, FERC, on its own initiative, established a cost allocation method for certain MISO-PJM projects. In this consolidated action, Petitioners challenge FERC's rejection of MISO's second proposal and FERC's corresponding implementation of a cost allocation method. For the reasons below, we deny the petitions and affirm FERC's orders in all respects.

3

## I.

Section 201 of the Act gives FERC jurisdiction over facilities that engage in transmission and sale of electricity at wholesale in interstate commerce. 16 U.S.C. § 824(b)(1). Under the Act, FERC has the power to review rates in connection with transmission services or sales to ensure that such rates are "just and reasonable" and to set aside as "unlawful" any rate or charge it deems not just and reasonable. 16 U.S.C. § 824d(a). Additionally, pursuant to Section 206, if FERC finds a rate or charge to be "unjust, unreasonable, unduly discriminatory or preferential," FERC "shall determine the just and reasonable rate . . . to be thereafter observed and in force, and shall fix the same by order." 16 U.S.C. § 824e(a).

In assessing whether a rate is "just and reasonable," FERC and the courts determine, among other things, whether the rate comports with the "cost-causation principle" which requires that the rates charged for electricity reflect the costs of providing it. *See Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018) (hereinafter "*Old Dominion*"). "We often frame this principle as one that ensures burden is matched with benefit, so that FERC generally may not single out a party for the full cost of a project, or even most of it, when the benefits of the project are diffuse." *Id.* (internal quotation marks and citations omitted).

Under a FERC regulation, known as "Order No. 1000," *see* Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities, 136 FERC ¶ 61,051 (2011), electric utilities are subject to two relevant requirements:

> First, utilities in each planning region must jointly produce a regional transmission plan to

determine what new facilities would best meet regional needs for electricity. Second, in their respective tariffs, utilities must include a formula for allocating the costs of new transmission facilities selected in the regional transmission plan for purposes of cost allocation. This formula must satisfy six general principles, the first of which is the cost-causation principle: The cost of transmission facilities must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits. Order No. 1000 requires each utility to show, through compliance filings, that its cost-allocation formula is consistent with the six specified principles.

*Old Dominion*, 898 F.3d at 1256 (internal quotation marks and citations omitted).

In accordance with Order No. 1000, MISO and PJM jointly planned—and subsequently approved as part of their respective regional transmission plans—interregional projects that connected and benefited both regions. Once interregional projects were identified, MISO and PJM allocated the costs of such projects between their regions. Each region then allocated its share of costs from the interregional project to subdivided zones within their own respective regions. This case involves the cost allocation method for MISO's share of a MISO-PJM interregional transmission project.

Under MISO's original regional transmission plan, MISO established different project categories, each with different qualifying criteria and cost allocations. MISO's share of an

interregional project's costs is then assigned according to the allocation method that corresponds with the MISO project type, of which there were historically three.[1] The most relevant category to this appeal is the "Market Efficiency Project"—a higher-voltage transmission project that reduces congestion and lowers the costs of power in the region. Originally, to qualify as a Market Efficiency Project, a transmission project was required to (1) cost at least $5 million, (2) consist of facilities that have voltages of 345 kilovolts (kV) or higher, and (3) have a total regional benefit-to-cost ratio of at least 1.25-to-1, with benefits measured using an Adjusted Production Cost Savings metric ("Production Cost Metric"). J.A. 355. The Production Cost Metric measures the extent to which a new transmission project will make electricity cheaper by measuring the total reduction in costs resulting from the new project. *See Midwest Independent Transmission System Operator, Inc.*, 118 FERC ¶ 61,209, ¶ 5 n.6 (2007). Under the original plan, once a project was deemed a Market Efficiency Project, 20 percent of the project cost was allocated on a region-wide basis to all customers across the entire MISO footprint (known as the "postage-stamp approach"). The remaining 80 percent was allocated to zones based on each zone's proportion of the Production Cost Metric benefits that it received. The orders on review stem from FERC's resolution of an earlier complaint proceeding and subsequent filings related to this original plan. We start with a brief summary of the relevant proceedings and filings.

---

[1] The three MISO project types are: Baseline Reliability Projects, Market Efficiency Projects, and Multi-Value Projects. *See* J.A. 354–55 (describing the three types of projects and corresponding allocation method).

Northern Indiana Public Service Company Complaint Order

In 2013, Northern Indiana Public Service Company ("NIPSCO"), a utility in northern Indiana whose transmission system connects to the "seams" of MISO's and PJM's systems, filed a complaint against MISO and PJM, seeking reform of the MISO-PJM joint interregional transmission planning process. *Northern Indiana Public Service Co. v. Midcontinent Independent System Operator, Inc.*, 155 FERC ¶ 61,058 (2016) (hereinafter "*NIPSCO Complaint Order*"). FERC granted in part and denied in part the NIPSCO Complaint, ordering, among other things, that MISO revise its Market Efficiency Project criteria. *Id.* ¶ 54. FERC found that MISO's then-current "cost and voltage thresholds prohibit from consideration certain transmission projects in the MISO-PJM interregional transmission planning process that benefit both regions, as evidenced by the Quick Hit Analysis,"[2] which was submitted by MISO. *Id.* ¶ 129. Given that the Quick Hit Analysis identified interregional projects that were less than the current voltage and cost thresholds but nevertheless provided benefits to both regions, FERC reasoned that such projects "should therefore not be automatically excluded from consideration." *Id.* ¶ 131. Accordingly, FERC directed MISO to lower its minimum voltage threshold for a Market Efficiency Project from 345 kV to 100 kV and to remove the $5 million minimum cost requirement. *Id.*

Given the revised lower voltage threshold, FERC found that MISO did not address what regional cost allocation method would apply to this new gap—that is, how MISO would allocate its "share of the cost of an interregional

---

[2] "The Quick Hit Analysis [was] an effort by MISO, PJM and its stakeholders to identify near-term interregional economic transmission projects to remedy recent historical interregional congestion issues." *NIPSCO Complaint Order*, ¶ 100 n.175.

economic transmission project operating above 100 kV but below the original threshold of 345 kV." J.A. 357. As such, FERC directed MISO to submit a further compliance filing to either confirm that MISO would apply the existing cost allocation method for Market Efficiency Projects or propose tariff revisions to apply a different regional cost allocation.

### 2019 First Regional & Interregional Filings

In February 2019, MISO filed proposals for both its regional and interregional transmission projects. J.A. 604–05. In its First Regional Filing, MISO proposed to (1) lower the minimum voltage threshold for Market Efficiency Projects from 345 kV to 230 kV and (2) eliminate the 20 percent region-wide cost sharing and instead allocate 100 percent of the costs to pricing zones based on a benefit-to-cost ratio measured not only by the Production Cost Metric but also two additional benefit metrics, the Avoided Reliability Project Savings Metric[3] and a MISO-SPP Settlement Agreement Cost Metric ("SPP Metric"). *Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Tariff Revisions, 167 FERC ¶ 61,258, ¶¶ 15–19 (2019) (hereinafter "*First Regional Order*"). Relevant here is the SPP Metric, which measures any savings or increased costs in annual payments—made by MISO to another region operator named Southwest Power Pool, Inc. ("SPP") pursuant to a settlement agreement—that result from the implementation of a Market Efficiency Project. *Id.* ¶ 17. MISO also proposed a new category of projects called Local Economic Projects, which would operate at above 100 kV and below 230 kV and would meet certain minimum

---

[3] This metric measures the "savings realized by transmission customers when a Market Efficiency Project eliminates the need to develop one or more future reliability projects." *First Regional Order*, ¶ 16.

regional and local benefit-to-cost ratios for each pricing zone in which a project is located. *Id.* ¶¶ 9–10. MISO proposed allocating 100 percent of the costs of these projects to the pricing zones in which the project is located, not based upon the benefits MISO calculates will accrue to all impacted pricing zones. *Id.*

In its First Interregional Filing, MISO proposed to create a new interregional transmission project category with SPP and PJM called an Interregional Economic Project, defined as any transmission project that qualifies as a Market Efficiency Project (230 kV or higher) or a Local Economic Project (between 100 kV and 230 kV) under the MISO-PJM plan. *Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Revisions and Compliance Filing and Directing Further Compliance, 167 FERC ¶ 61,259, ¶¶ 5–7 (2019) (hereinafter "*First Interregional Order*"). MISO further proposed to allocate costs of MISO's share of these projects in the same manner as the corresponding regional project categories. *Id.* ¶¶ 8–9.

FERC rejected MISO's First Regional Filing because it determined that the proposed cost allocation method for Local Economic Projects was not just and reasonable. *First Regional Order*, ¶ 1. Specifically, FERC found the proposed benefits test for the Local Economic Project category—which would require both a minimum regional and local benefit-to-cost ratio—was inconsistent with the cost causation principle. *Id.* ¶¶ 56–63. MISO would identify the project's regional benefits, but ignore such benefits and instead implement its preferred method of allocating 100 percent of the project's costs to the pricing zone where the project is located, rather than to all the zones that have been identified as beneficiaries. *Id.* Put simply, FERC found that the proposal failed to allocate costs commensurate with benefits. *Id.* ¶ 63. Additionally, because

the proposals in MISO's First Interregional Filing relied on definitions and provisions rejected in the First Regional Filing, FERC rejected the interregional proposal as well. *First Interregional Order*, ¶ 21. It directed MISO to submit a further compliance filing addressing the allocation of MISO's share of costs for interregional projects between 100 kV and 345 kV. *Id.*

2020 Second Regional & Interregional Filings

In January 2020, MISO again submitted companion proposals for certain regional network upgrades ("Second Regional Filing") and interregional projects ("Second Interregional Filing"). In its Second Regional Filing, MISO again proposed to create a new project type, Local Economic Projects, with the same qualifying criteria as outlined in the First Regional Filing. *Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Tariff Revisions, 170 FERC ¶ 61,241, ¶¶ 13–16 (2020) (hereinafter "*Second Regional Order*"). However, it removed the requirement that the project meet the minimum regional benefit-to-cost ratio and instead proposed that the project meet only the minimum local benefit-to-cost ratio. *Id.* ¶ 16. MISO contended that this change rectified the cost causation principle issue discussed in the *First Regional Order* because costs would only be allocated to the local pricing zone based on demonstrable benefits identified using the three benefit metrics (outlined in the previous section), which would account for project type differences. *Id.*

In its Second Interregional Filing, which was "designed to work seamlessly with the revisions proposed in the [Second Regional Filing]," J.A. 300, MISO again proposed to create a new Interregional Economic Project category, with differing cost allocation methods depending on the voltage level.

*Midcontinent Independent System Operator, Inc.*, Order Rejecting Proposed Revisions and Compliance Filing and Establishing Just and Reasonable Rate, 170 FERC ¶ 61,242 (2020) (hereinafter "*Second Interregional Order*"). For Interregional Economic Projects with a voltage level of 230 kV or higher, MISO proposed allocating its share of costs from the MISO-PJM interregional project the same way as Market Efficiency projects, namely allocating 100 percent of the costs to the pricing zones that benefit from the project. *Id.* ¶ 11. For projects between 100 kV and 230 kV, MISO proposed a cost allocation method similar to the category of Local Economic Projects in the Second Regional Filing—that is, allocating 100 percent of the projects' costs to the pricing zones in which the project is located. *Id.* ¶ 12.

In companion orders issued on March 20, 2020, FERC again rejected both MISO's Second Regional and Second Interregional Filing. In rejecting MISO's Second Regional Filing, FERC again found that the cost allocation method for Local Economic Projects was not just and reasonable because it remained inconsistent with the cost causation principle. *Second Regional Order*, ¶ 59. Despite the removal of the regional benefit-to-cost ratio requirement, FERC found MISO's Second Regional Filing to be "identical to the proposal previously rejected in the 2019 [First] Regional Order." *Id.* ¶ 60. FERC determined that the Second Regional Filing was not consistent with the cost causation principle because it inappropriately relied on the SPP metric, which would calculate benefits outside of the local pricing zone where the project is located, but then disregard these benefits by allocating costs solely within that pricing zone. *Id.* ¶ 59; *see also id.* ¶¶ 66–67. FERC further found it "incongruous" for MISO to apply the Production Cost Metric, which MISO states is the most reliable measure of a net impact of a project, only to the zone where the project is physically located. *Id.* ¶ 68.

FERC affirmed these findings on rehearing. *See Midcontinent Independent System Operator, Inc.*, Order Addressing Arguments Raised on Rehearing, 172 FERC ¶ 61,100 (2020) (hereinafter "*Regional Rehearing Order*").

Because MISO's Second Interregional Filing also relied on provisions and definitions in the Second Regional Filing, FERC again rejected MISO's interregional filing. *Second Interregional Order*, ¶ 29. FERC also determined that its rejection of this filing meant that MISO's outstanding compliance requirement—to establish a cost allocation method for interregional projects between 100 kV and 345 kV—remained unfulfilled. *Id.* ¶ 30. As such, FERC exercised its authority under Section 206 of the Act, to establish a "just and reasonable rate." *Id.* FERC determined that it was appropriate to allocate "100% of MISO's share of the cost of MISO-PJM interregional economic transmission projects" between 100 kV and 345 kV "that qualify as Market Efficiency Projects" using MISO's Production Cost Metric ("Replacement Method"). *Id.* ¶ 31. On rehearing, FERC again confirmed its rejection of MISO's Second Interregional Filing as well as its establishment of a cost allocation method for interregional projects between 100 kV and 345 kV. *See Midcontinent Independent System Operator, Inc.*, Order on Compliance and Addressing Arguments Raised on Rehearing, 172 FERC ¶ 61,101 (2020) (hereinafter "*Interregional Rehearing Order*").

<u>2020 Third Regional Filing</u>

In April 2020, MISO submitted a Third Regional Filing with no corresponding interregional filing, which FERC subsequently accepted. *See Midcontinent Independent System Operator, Inc.*, Order Accepting Proposed Tariff and Transmission Owners Agreement Revisions, 172 FERC

¶ 61,095 (2020) (hereinafter "*Third Regional Order*"). Specifically, FERC approved MISO's proposal to (1) lower the Market Efficiency Projects' minimum threshold voltage from 345 kV to 230 kV; (2) eliminate the 20 percent system-wide allocation; and (3) allocate 100 percent of the project costs based on each pricing zone's identifiable net-positive benefits as determined by three separate benefit metrics. *Id.* ¶¶ 33, 46.

## Procedural History

Petitioners are members of the MISO Transmission Owners, which is "a group of investor-owned transmission owners, cooperative utilities, and municipal utilities that own electric transmission facilities over which . . . [MISO] provides electric transmission service." Case No. 20-1262, Dkt. No. 1852900, at 2. On July 17, 2020, the MISO Transmission Owners group filed a petition for review of the *Second Interregional Order*. *Id.* at 1. After members of the group withdrew from the case, the remaining instant Petitioners[4] moved to rename the appeal and filed a second petition for review of the *Interregional Rehearing Order*. *See* Case No. 20-1391, Dkt. No. 1864341, at 1–2. On October 2, 2020, the Court consolidated the appeals. Case No. 20-1391, Dkt. No. 1864529. MISO as well as the Mississippi Public Service Commission and the Mississippi Public Utilities Staff (together, "MPSC") filed motions to intervene, which were subsequently granted. *See* Case No. 20-3191, Dkt No. 1867511, Dkt No. 1865903; Dkt. No. 1869462. While MPSC intervened in support of Petitioners, *see* Case No. 20-1391,

---

[4] Petitioners include: Entergy Arkansas, LLC; Entergy Louisiana, LLC; Entergy Mississippi, LLC; Entergy New Orleans, LLC; Entergy Texas, Inc.; Northern States Power Co. (a Minnesota corporation, subsidiary of Xcel Energy Inc.); and Northern States Power Company (a Wisconsin corporation, a subsidiary of Xcel Energy Inc.).

Dkt. No. 1872536, MISO only filed a notice advising the Court that it "neither supports nor opposes the Petitioners' or the Respondents' positions" but rather only sought to "preserve its opportunity to participate as needed," Case No. 20-1391, Dkt. No. 1871683, at 2.

**II.**

This Court reviews FERC's orders under the arbitrary and capricious standard. *FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 446 (D.C. Cir. 2005). "Under the arbitrary-and-capricious standard of review, we uphold FERC decisions if the agency has examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Old Dominion*, 898 F.3d at 1260 (internal quotation marks and citations omitted). "In reviewing FERC's orders, we are particularly deferential to the Commission's expertise with respect to ratemaking issues." *ExxonMobile Oil Corp. v. FERC*, 487 F.3d 945, 951 (D.C. Cir. 2007) (per curiam) (internal quotation marks and citation omitted); *see also Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) ("In matters of ratemaking, our review is highly deferential, as issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission.") (internal quotation marks, alterations, and citations omitted). "The court owes the Commission great deference in this realm because the statutory requirement that rates be just and reasonable is obviously incapable of precise judicial definition, and the Commission must have considerable latitude in developing a methodology responsive to its regulatory challenge." *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 55 (D.C. Cir. 2014) (per curiam) (internal quotation marks and citations omitted) (cleaned up). However, the court will set aside FERC's orders regarding allocation of

costs if they are either unreasonable or inadequately explained. *Old Dominion*, 898 F.3d at 1260.

**III.**

As an initial matter, we address the question of standing. Even where, as here, FERC does not dispute standing, "we have an 'independent obligation to assure ourselves that standing exists.'" *Exelon Corp. v. FERC*, 911 F.3d 1236, 1240 (D.C. Cir. 2018) (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 499 (2009)) (alteration accepted). Petitioners assert that under FERC's Replacement Method, MISO will allocate some of the costs of rebuilding an existing 138 kV line ("Project NC-11"), located on the northern border of Indiana, to Petitioners' customers across eleven zones in the MISO region. *See* Pet'r Br. at 6. Yet, some of these customers do not benefit from Project NC-11. *Id.* at 7. By contrast, Petitioners contend that under MISO's proposed cost allocation method, none of the costs would be allocated to its customers consistent with cost causation principles. *Id.* We conclude that these assertions are sufficient to establish standing, given that a favorable decision by this Court would remedy Petitioners' injuries.

Petitioners challenge both FERC's rejection of MISO's Second Interregional Filing as well as FERC's establishment of a Replacement Method for cost allocation. We address each challenge in turn.

**A. MISO's Second Interregional Filing**

In its Second Interregional Filing, MISO proposed to create a new category of projects called Interregional Economic Projects (with voltages between 100 kV and 230 kV), using the same cost allocation method as used for Local

Economic Projects in its Second Regional Filing. *Second Interregional Order*, ¶ 12. Specifically, it proposed allocating 100 percent of MISO's share of costs of the project to the pricing zone in which the project is located. *Id.* FERC found that this allocation method was inconsistent with the cost causation principle because it inappropriately relied on the SPP Metric, which in FERC's view would likely identify regional transmission benefits that MISO would ultimately disregard in allocating costs. *Second Regional Order*, ¶ 67. The SPP Metric measures the reduction in annual payments from MISO to SPP pursuant to the MISO-SPP Settlement Agreement that allows MISO to make better economic use of its system. Under the settlement agreement, MISO pays SPP for the use of inadvertent flows over SPP's grid that are tied to the amount of transmission capacity that MISO controls in the MISO-SPP Settlement Region. MISO then passes on the SPP charges to the utilities on MISO's grid in a two-part charge based on a *pro rata* share plus an estimate of benefits from increased flows allowed by the payments. A new transmission line on MISO's system could increase MISO's transmission capacity, thereby decreasing the payments MISO would have to make to SPP. Consequently, it would reduce the payments each utility zone makes to MISO. The SPP Metric measures the benefits that flow to each utility zone—that is, the reduced payments it would have to make to MISO—as a result of a project's impact on MISO's transmission capacity. These benefits are calculated for all of the pricing zones within the MISO region. Yet MISO's benefit-cost determination would consider only the portion of these benefits calculated for the pricing zone in which the project is physically located. *Second Regional Order*, ¶ 67.

FERC found that, based on the Court's decision in *Old Dominion*, MISO's proposed allocation method using the SPP metric was inconsistent with the cost causation principle. *Id.*

¶ 69.    In *Old Dominion*, FERC approved a proposal to eliminate cost-sharing for two high-voltage transmission lines that benefitted the entire region, resulting in a local zone bearing the entire cost of the two regionally-beneficial projects. 898 F.3d at 1255.  Specifically, although FERC found that high-voltage transmission projects have significant regional benefits that accrue to all members of the transmission operator, it approved a hybrid cost-allocation method which allocated half of the costs on a *pro rata* basis, regardless of where the specific project is located (postage stamp component), and the remaining costs based on an estimate of which zones most directly benefit from the project.  *Id.* at 1256–57.  FERC viewed the hybrid cost allocation method as roughly commensurate with the benefits received because the postage stamp component captured the full spectrum of benefits including those regional benefits that are difficult to quantify.  *Id.* at 1257.  The Court found that FERC's decision to approve this proposal was arbitrary because "the cost-causation principle prevents regionally beneficial projects from being arbitrarily excluded from cost sharing—a necessary corollary to ensuring that the costs of such projects are allocated commensurate with their benefits."  *Id.* at 1263. Here, FERC noted that the concern expressed in *Old Dominion* applied "with similar force" to MISO's proposed cost allocation method because it would determine benefits outside of the local zone where the project was located "but then disregard these benefits and allocate costs for the project solely within one Transmission Pricing Zone." *Second Regional Order*, ¶ 69.  Petitioners make three main arguments challenging this finding, which we address in turn.

First, Petitioners contend that it was reversible error for FERC to reject the Second Interregional Filing simply because it shared tariff language with the Second Regional Filing that FERC rejected.  In Petitioners' view, FERC was obligated to

independently evaluate the Second Interregional Filing to determine if its local zone allocation was appropriate for low-voltage interregional projects. This argument quickly fails. According to MISO's own representations to FERC in its filings, the Second Interregional Filing was "designed to work seamlessly with the revisions proposed in the [Second Regional Filing]" and relied on definitions and provisions in the Second Regional Filing. J.A. 300. As such, it was appropriate and well within FERC's discretion to reject MISO's Second Interregional Filing based on its rejection of the Second Regional Filing, as it would obviously suffer from the same critical flaw. *See Tenn. Valley Mun. Gas Ass'n v. FERC*, 140 F.3d 1085, 1088 (D.C. Cir. 1998) ("An agency has broad discretion to determine when and how to hear and decide the matters that come before it.").

Second, Petitioners maintain that FERC's decision was arbitrary and capricious because FERC failed to identify significant regional benefits provided by interregional transmission projects. In support of this contention, Petitioners point to FERC's statement in its *Third Regional Order* that "neither MISO nor the Commission in the March 2020 Order has made the finding that MISO projects between 100 kV and 230 kV produce 'significant regional benefits,'" *Third Regional Order*, ¶ 49, as evidence that such projects do not have regional benefits. Petitioners also argue that FERC ignored the testimony of MISO's expert that benefits from projects below 230 kV are "generally smaller and locally concentrated." J.A. 278.

These arguments are without merit. First, as FERC noted, it made clear that its *Third Regional Order* was only addressing *regional* projects, not interregional ones. *See Third Regional Order*, ¶ 51. Similarly, MISO's expert testimony was in support of MISO's Second Regional Filing and therefore

discussed the mostly localized, rather than regional benefits, of *regional* projects, not interregional ones. *Compare* J.A. 246–83 (expert's regional filing testimony), *with* J.A. 319–44 (expert's interregional filing testimony). Second, Petitioners' argument is fatally flawed because the very subject of these compliance filings and orders is the development of cost allocation methods for interregional projects that both MISO and PJM have already determined would benefit their respective regions. Indeed, in its original *NIPSCO Complaint Order*, FERC found that the Quick Hit Analysis submitted by MISO demonstrated that some interregional projects below 345 kV provided benefits to both regional systems and thus, ordered MISO to lower the voltage threshold to 100 kV so such projects could be accounted for in cost allocation.[5] *See NIPSCO Complaint Order*, ¶¶ 129, 131.

---

[5] We reject Petitioners' contention that FERC is barred on appeal from relying on the Quick Hit Analysis. Under the principles of *SEC v. Chenery Corp.*, 318 U.S. 80 (1943), a court's review of an agency order is limited to the grounds upon which the agency itself based its action and "agency decisions may not be affirmed on grounds not actually relied upon by the agency." *Calpine Corp. v. FERC*, 702 F.3d 41, 46 (D.C. Cir. 2012) (citing *Chenery*, 318 U.S. at 87–88). Here, while FERC did not explicitly reference the Quick Hit Analysis in its *Second Regional Order*, it relied on the Quick Hit Analysis as the basis for its original directive that MISO lower the Market Efficiency Project threshold because the Quick Hit Analysis identified lower-voltage interregional projects that benefitted both regions and therefore should "not be automatically excluded from consideration." *NIPSCO Complaint Order*, ¶ 131. In response to this finding and directive, MISO was required to submit compliance filings demonstrating a cost allocation method for these projects. These compliance filings and orders are the subject of the instant appeal. As such, the Quick Hit Analysis necessarily was a ground that FERC actually relied on in its *Second Regional Order* because it serves as the basis for FERC's original directive that MISO was seeking to comply with. *See Second Regional Order*, ¶¶ 5–6

Lastly, Petitioners contend that FERC erroneously departed from the cost causation principle in *Old Dominion* by requiring exact precision in cost allocation. We disagree. A general principle of *Old Dominion* is that in order for a cost allocation method to be consistent with the cost causation principle, such method cannot "prevent[] regionally beneficial projects from being arbitrarily excluded from cost sharing." *Old Dominion*, 898 F.3d at 1263. FERC reasonably concluded that MISO's proposed cost allocation method would do just that. The SPP Metric measures the benefits that flow to each utility zone, i.e., the reduced payments it would have to make to MISO, as a result of a project's impact on MISO's transmission capacity. These benefits are calculated for all of the pricing zones within the MISO region, yet MISO would only use the portion of these benefits calculated for the pricing zone in which the project is physically located for its benefit-cost determination. *Second Regional Order*, ¶ 67. Because MISO's SPP Metric would identify regional benefits,[6] disregarding such known benefits in cost allocation is inconsistent with the cost causation principle. Accordingly,

---

(discussing FERC's findings and directives in the *NIPSCO Complaint Order* as background and the basis for MISO's current compliance filing). Indeed, Petitioners concede this point but instead proffer arguments relating to the underlying merits of the Quick Hit Analysis, which are jurisdictionally barred as such arguments were not raised on FERC's rehearing of the *NIPSCO Complaint Order* in 2017. *See* 16 U.S.C. § 825l(b).

[6] We note that Petitioners' arguments regarding the irrelevance of the SPP Metric to the MISO-PJM interregional planning process are jurisdictionally barred by Section 313(b) of the Act because Petitioners failed to raise it on agency rehearing. *See* 16 U.S.C. § 825l(b).

FERC reasonably rejected MISO's Second Interregional Filing.

## B. FERC's Replacement Cost Allocation Method

Because it found that MISO's outstanding compliance requirement to establish a cost allocation method for MISO's share of MISO-PJM interregional projects between 100 kV and 345 kV remained unfulfilled, FERC exercised its authority, pursuant to Section 206 of the Act, to allocate the entirety of MISO's share of the cost of such projects that qualify as Market Efficiency Projects using MISO's current Production Cost Metric. *Second Interregional Order*, ¶¶ 30–31. We find that Petitioners fail to meet its burden of demonstrating that FERC's Replacement Method was not just and reasonable. As FERC noted in its order, the Production Cost Metric is one that MISO had been using to calculate benefits of Market Efficiency Projects since their inception in 2007 and is regarded by MISO as one of its most reliable measures of the net economic impact of a project. *Id.* ¶ 31; *Midwest Independent Transmission System Operator, Inc.*, 118 FERC ¶ 61,209, ¶ 30. Additionally, FERC explained that MISO already uses this metric in its cost allocation method for Market Efficiency Projects at 345 kV and above. *Second Interregional Order*, ¶ 31. To be sure, MISO's expert did testify that lower-voltage projects may be more sensitive to incorrect assumptions under this metric, thereby flagging a potential flaw in the use of this metric. However, Petitioners have not demonstrated that the use of this metric is so unreasonable or deficient as to warrant reversal.[7] Rather, at bottom, Petitioners

---

[7] Petitioners' arguments regarding FERC purportedly ignoring its evidence concerning a specific interregional project, Project NC-11, are not properly before the Court because such evidence is not in the administrative record as FERC rejected Petitioners' late-filed

simply argue that, in its view, a better method exists. "But FERC is not required to choose the best solution, only a reasonable one." *Petal Gas Storage, LLC v. FERC*, 496 F.3d 695, 703 (D.C. Cir. 2007) (citation omitted). It is not our job to determine that "FERC made the better call," rather, our "important but limited role is to ensure that the Commission engaged in reasoned decisionmaking—that it weighed competing views, selected a . . . formula with adequate support in the record, and intelligibly explained the reasons for making that choice." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 295 (2016). FERC has satisfied this standard. Notably, MISO still has the right to propose its own cost allocation method for FERC to review, and if found to be just and reasonable, to approve. *See Second Interregional Order*, ¶ 31 n.40; *Interregional Rehearing Order*, ¶ 30. Accordingly, we affirm FERC's Replacement Method.

**IV.**

For the foregoing reasons, we deny the petitions for review and affirm FERC's orders in all respects.

*So ordered.*

---

pleading containing this evidence. *See Interregional Rehearing Order*, ¶ 15.