# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**
August 2, 2023

Lyle W. Cayce
Clerk

No. 18-60575

———————

El Paso Electric Company,

*Petitioner*,

*versus*

Federal Energy Regulatory Commission,

*Respondent*.

———————————————————

Appeal from the Federal Energy Regulatory Commission
Agency Nos. 161 FERC 61,188,
163 FERC 61,204

———————————————————

Before Jones, Southwick, and Ho, *Circuit Judges*.
Edith H. Jones, *Circuit Judge*:

Seven years ago, this court vacated, as arbitrary and capricious, the Federal Energy Regulatory Commission's ("FERC") cost allocation scheme for electrical grid improvements in the WestConnect region, which covers utility service to much of the American West. *El Paso Elec. v. FERC*, 832 F.3d 495, 505–06 (5th Cir. 2016) ("*El Paso Elec. I*"). Because FERC had not reasonably explained how its orders, which implement the generally applicable Order No. 1000, complied with the Federal Power Act's requirement that rates be "just and reasonable," we remanded for further proceedings. FERC was instructed to provide more complete justification

No. 18-60575

for its orders. The petition under review asserts that the reasons FERC gave on remand remain insufficient. We agree. FERC's orders violate the Federal Power Act as a matter of law and, alternatively, the agency has again inadequately explained its actions. The cost causation principle that binds FERC does not authorize it to force its regulated jurisdictional utilities to assume the costs of providing service to non-jurisdictional utilities. We therefore GRANT the petition and REVERSE the orders.

## I. Background

The court thoroughly summarized this case's regulatory, factual, and procedural history in *El Paso Elec. I*. Only the highlights and more recent developments warrant attention here. *See* 832 F.3d at 499–503.

### A. The Federal Power Act

The Federal Power Act ("FPA") gives FERC "jurisdiction over all facilities" involved in "the transmission of electric energy in interstate commerce." 16 U.S.C. § 824(b)(1). The FPA requires that "[a]ll rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy . . . be just and reasonable." 16 U.S.C. § 824d(a). "For decades, the Commission and the courts have understood this requirement to incorporate a 'cost-causation principle'—the rates charged for electricity should reflect the costs of providing it." *Old Dominion Elec. Coop. v. FERC*, 898 F.3d 1254, 1255 (D.C. Cir. 2018). This principle is "foundational" and a "basic tenet" of ratemaking. *El Paso Elec. I*, 832 F.3d at 505; *S.C. Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 85 (D.C. Cir. 2014) (per curiam) ("*South Carolina*").

FERC need not "utilize a particular formula" when applying this principle, nor "allocate costs with exacting precision." *Old Dominion*, 898 F.3d at 1260. FERC may even "emphasize other, competing policies and approve measures that do not best match cost responsibility and causation."

2

No. 18-60575

*Carnegie Nat. Gas Co. v. FERC*, 968 F.2d 1291, 1294 (D.C. Cir. 1992). Nevertheless, "all approved rates [must] reflect to some degree the costs actually caused by the customer who must pay them." *KN Energy, Inc. v. FERC*, 968 F.2d 1295, 1300 (D.C. Cir. 1992); *see also Ill. Com. Comm'n v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009) (Benefits should be "at least roughly commensurate" with costs.). Courts have generally held that costs "are to be allocated to those who cause the costs to be incurred and reap the resulting benefits." *Nat'l Ass'n of Reg. Util. Comm'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007); *see also BNP Paribas Energy Trading GP v. FERC*, 743 F.3d 264, 268 (D.C. Cir. 2014) (The principle is a "matter of making sure that burden is matched with benefit.").

## B. Order No. 1000

In 2011, FERC promulgated Order No. 1000 to promote efficient and cost-effective regional transmission planning and provide that grid improvement costs are allocated fairly among regional beneficiaries. *See Transmission Planning and Cost Allocation by Transmission Owning and Operating Public Utilities*, Order No. 1000, 136 FERC ¶ 61,051 at PP 4, 487 (2011) ("Order No. 1000").[1] Noting the "fundamental link" between regional planning and "cost allocation," FERC implemented a number of cost allocation reforms. *Id.* at P 599. These require jurisdictional utilities to develop "a method . . . for allocating *ex ante* the costs of new regional transmission facilities that complies with six regional cost allocation principles." *El Paso Elec. I*, 832 F.3d at 499 (quoting *South Carolina*, 762 F.3d at 53). The first and "most pertinent" is the well-established "cost causation" principle. *Id.* Accordingly, the "cost of transmission facilities

───────────────

[1] FERC responded to requests for rehearing and clarification with Order No. 1000-A. 139 FERC ¶ 61,132 (May 17, 2012). We refer to both orders as "Order No. 1000."

3

must be allocated to those within the transmission planning region that benefit from those facilities in a manner that is at least roughly commensurate with estimated benefits." *Id.* at 500; Order No. 1000 at PP 586, 622.

A stated purpose is "to prevent subsidization by ensuring that costs and benefits correspond to each other." Order No. 1000-A at P 578. "Free ridership," where "an entity is not required to pay for a benefit it receives," is the main form of subsidization combatted by the cost-causation principle. *Id.* at P 573. Requiring jurisdictional utilities to "allocate the costs of their new transmission facilities to the beneficiaries of those facilities" is one step toward "eliminat[ing] free riders on the transmission grid." *Id.* at PP 568–69. Further, stated Order No. 1000, if compliance with the cost causation principle were not mandated, FERC would be unable to address free ridership and thus "ensure that rates . . . are just and reasonable." *Id.* at 535.

Crucially, Order No. 1000 applies only to public utilities subject to FERC jurisdiction. FERC appears to have statutory authority under § 211A of the FPA "to require participation in these processes by non-jurisdictional utilities," but it "has thus far declined to exercise" it. *El Paso Elec. I*, 832 F.3d at 500 (emphasis omitted). Non-jurisdictional utilities may, however, join a transmission planning region for cost allocation purposes by "enrolling" in the region. Order No. 1000-A at PP 275, 656. But Order No. 1000 explicitly provides that jurisdictional utilities are "not required to plan for the transmission needs of . . . a non-[jurisdictional] utility transmission provider that has not made the choice to join." *Id.* at P 276.

C.  Factual and Procedural History

In the WestConnect transmission planning region, jurisdictional and non-jurisdictional electric utility transmission providers are roughly equal in number and are interspersed throughout the vast geographic region. *El Paso Elec. I*, 832 F.3d at 501. According to FERC, the jurisdictional and non-

No. 18-60575

jurisdictional utilities' transmission services are highly integrated. Historically, they enjoyed a mutually beneficial relationship in which they planned new transmission facility projects together and allocated funding through negotiated agreement. *Id.* Under Order No. 1000 as implemented by the cost allocation scheme ordered by FERC, however, the WestConnect jurisdictional utilities must take into account the transmission needs of the non-jurisdictional utilities when planning a new facility *and* the jurisdictional utilities must pay for the facility's development. *Id.* at 501–02. The non-jurisdictional utilities may pay if they so choose. *Id.* Specifically, regional planning would proceed according to the following process:

1. WestConnect jurisdictional utilities and coordinating transmission owners ("CTOs") (non-jurisdictional utilities that elect to participate in planning) identify the transmission needs of utilities in the region.

2. They then determine whether a single project could meet multiple utilities' transmission needs.

3. If so, they examine whether the project satisfies the cost allocation criteria, including a benefit-to-cost ratio of at least 1.25 to 1.

4. Cost allocations are then determined among participating utilities, at which point CTOs choose whether to accept their allotment. If they opt out, the benefit-to-cost ratio is recalculated.

5. If the project continues to satisfy the ratio, then all jurisdictional utilities and CTOs, including those that opted out of cost allocation, vote whether to solicit bids from a developer.

6. The selected developer can recoup costs only from jurisdictional transmission utilities and CTOs that have volunteered to pay, not CTOs that opt out.

No. 18-60575

In 2014, the WestConnect jurisdictional utilities, led by El Paso Electric Company ("EPE"), petitioned this court for review of FERC's orders implementing Order No. 1000.[2] *Id.* at 502–03. The court held that FERC's orders were arbitrary and capricious because they failed to "apply that foundational principle of cost causation for about half of the utilities in the WestConnect region." *El Paso Elec. I*, 832 F.3d at 505. FERC had not "provide[d] a reasoned explanation for why the non-jurisdictional utilities have incentive or obligation to participate in binding cost allocation when they can get many of the same benefits at the jurisdictional utilities' expense." *Id.* And FERC had failed to explain how the "lack of participation" in cost allocation by those beneficiaries would "not result in unjust and unreasonable rates." *Id.* at 507. The court concluded that FERC had "failed to explain how the current orders satisfy its statutory mandate—except by ignoring the benefits the non-jurisdictional utilities would receive." *Id.* at 507 n.13 The court vacated the orders and remanded "for further explanation and fact finding." *Id.* at 510.

Over a year later, FERC responded to our stated concerns. *See* 161 FERC ¶ 61,188 (2017) ("Order on Remand"). First, the agency insisted that non-jurisdictional utilities are likely to submit to binding cost allocation on a project-by-project basis so that important grid improvement initiatives satisfy the benefit-to-cost threshold ratio and thus proceed toward development. *Id.* at PP 43–47. Second, because this threshold ratio ensures that a project's benefits substantially outweigh its costs, the cost-causation's requirement that benefits be "roughly commensurate" with costs will always be met. *Id.* at P 51. Finally, FERC noted that it could always reconsider its

---

[2] The validity of Order No. 1000 is not at issue in this appeal.

No. 18-60575

approach if free ridership turns out to be a bigger problem than anticipated. *Id.* at P 54.[3]

The jurisdictional utilities requested a rehearing, arguing that FERC did not address the deficiencies in its orders previously vacated by this court. FERC denied the request, stating that the risk of free-ridership was acceptable because the only way to eliminate the risk would also "reduce the effectiveness" of FERC's other policy objectives. 163 FERC ¶ 61,204 at P 10 (2018) ("Order Denying Rehearing").

EPE petitioned this court for review of FERC's Order on Remand and Order Denying Rehearing. The other WestConnect jurisdictional utilities ("Public Utilities") intervened in support of EPE, and the non-jurisdictional utilities intervened in support of FERC. In December 2018, this court stayed the appeal to give the parties a chance to settle. In late 2022, FERC rejected the settlement agreement reached by the WestConnect jurisdictional and non-jurisdictional utilities. The petition is now ripe for review.

## II. DISCUSSION

FERC's orders are reviewed under the Administrative Procedure Act's "arbitrary and capricious" standard and will pass muster so long as the agency has "examined the relevant considerations and articulated a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292, 136 S. Ct. 760, 782 (2016) (alterations adopted). Although FERC enjoys "great deference . . . in its rate decisions," *id.*, its

_____

[3] Additionally, FERC explained that Order No. 1000's so-called "reciprocity condition," which would allow public utilities to cut off all new transmission service to non-public utilities who refuse to participate in cost allocation, provides an adequate impetus for non-public utility enrollment. *Id.* at P 53. FERC now disclaims any reliance on this argument.

orders must be set aside if "not in accordance with law." *FCC v. NextWave Pers. Commc'ns*, 537 U.S. 293, 300, 123 S. Ct. 832, 838 (2003) (citing 5 U.S.C. § 706(2)(A)). Particularly in this remand context, where FERC was ordered to flesh out its reasoning, we observe the earlier panel's holding that "the deference we owe to FERC is not unlimited." *El Paso Elec. I*, 832 F.3d at 503.

EPE and the Public Utilities make two primary arguments: first, that FERC's cost allocation scheme violates the FPA and Order No. 1000 as a matter of law; and second, that FERC's orders are arbitrary and capricious because they fail to give an adequate explanation on remand. We discuss each argument in turn.

## A. FERC's Orders are Unlawful

FERC's orders fail as a matter of law, argues EPE, because they mandate for the non-jurisdictional utilities a right to free ride, violating the FPA and contrary to Order No. 1000.[4] In the same vein, the Public Utilities contend that the kind of free ridership permitted under FERC's orders is a *per se* violation of the requirement that rates be just and reasonable.

FERC responds that although some free ridership could "theoretically occur" under its orders, the cost-causation principle has never been so rigidly applied as to require the elimination of free ridership. Order on Remand at P 39. FERC asserts that courts have understood that cost-causation can give way to other competing policy goals. And costs need only be "roughly commensurate" to benefits under the cost causation principle

---

[4] The non-public utilities call this an impermissible collateral attack on Order No. 1000. This court adjudicated that question in *El Paso Elec. I* and held that EPE's challenge is not a collateral attack. 832 F.3d at 495.

No. 18-60575

because, given the physical flow of electricity, some free ridership within an interconnected system is inevitable. Order Denying Rehearing at P 15.

FERC made these same arguments in *El Paso Elec. I*. *See* Brief of Respondent at 25–32, *El Paso Elec. I* (No. 14–60822). There, as here, it predicated its position on *South Carolina Public Service Authority v. FERC*, 762 F.3d 41 (D.C. Cir. 2014) (per curiam). Brief of Respondent at 30, *El Paso Elec. I*; *see also* Order Denying Rehearing at PP 13–14.

In *South Carolina*, dozens of petitioners brought a facial challenge against Order No. 1000. 762 F.3d at 48. One group argued that FERC lacked the authority to adopt the cost allocation requirements. *Id.* at 82. (That argument is not raised here.) Another argued that FERC acted arbitrarily and capriciously because the cost allocation reforms "did not go far enough." *Id.* Specifically, those petitioners complained that Principle 4 of the six regional cost allocation principles "fails to require cost allocation to extra-regional beneficiaries." *Id.* at 87. By adopting Principle 4, FERC "limited required cost allocation to *within* regions, noting that doing so, 'may lead to some beneficiaries of transmission facilities escaping cost responsibility because they are not located in the same transmission planning region as the transmission facility.'" *Id.* (emphasis added) (quoting Order No. 1000 at P 660). This would permit beneficiaries to free ride, argued the petitioners, who sit just outside the "'rather arbitrarily' drawn region in which the new facility is located." *Id.* at 88.

The court acknowledged that because rates need only "*reflect to some degree* the costs actually caused by the customer who must pay them," *id.* (quoting *KN Energy*, 968 F.2d at 1300), FERC can approve a "rate mechanism that tracks cost-causation principles less than perfectly." *Id.* (quoting *Sithe/Indep. Power Partners v. FERC*, 285 F.3d 1, 5 (D.C. Cir. 2002)). Further, FERC "may rationally emphasize other, competing policies and

approve measures that do not best match cost responsibility and causation." *Id.* (quoting *Carnegie Nat'l Gas*, 968 F.2d at 1293–94).  The court thus concluded that FERC's "balancing of the competing goals of reducing monitoring burdens and adopting policies that ensure that cost allocation maximally reflects cost causation is wholly reasonable." *Id.*

In *El Paso Elec. I*, FERC invoked the same reasoning in *South Carolina* to uphold the cost allocation scheme at issue in the WestConnect region.  But the court majority in *El Paso Elec. I* noted that EPE's petition differs from the petition that "generally challenged" FERC's regulation in *South Carolina*.[5] *Id.* at 504.  FERC's reasoning following remand does not fortify its reliance on *South Carolina*.

EPE and the Public Utilities distinguish *South Carolina* by emphasizing that fundamentally different kinds of free-ridership are implicated in the two cases.  The free riders contemplated in *South Carolina*, they argue, comprised "*unintended*, residual beneficiaries outside of a planning region"; whereas here, the non-jurisdictional utility free riders sit within the WestConnect region and are "specifically and intentionally designated as beneficiaries." This distinction is indeed fundamental.  Its legal import stems from the statutory mandates served by the cost-causation principle and the means employed to meet those ends.

The FPA's statutory requirement is twofold: (1) rates must be "just"; and (2) rates must be "reasonable."  16 U.S.C. § 824d(a).  The cost-causation principle, as understood by the courts and articulated in Order No. 1000, serves this mandate in two distinct ways.  First, to ensure that rates are "just," the principle prevents "subsidization by ensuring that costs and

---

[5] Judge Reavley's dissent found *South Carolina* "indistinguishable." 832 F.3d at 512 (Reavley, J., dissenting).

benefits correspond to each other." Order No. 1000-A at P 578; *see also BNP Paribas Energy Trading GP*, 743 F.3d at 268 (the "principle itself manifests a kind of equity . . . as a matter of making sure that burden is matched with benefit"); *Nat'l Ass'n of Reg. Util. Comm'rs.*, 475 F.3d at 1285 ("costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits").

Second, to guarantee that rates are "reasonable," cost-causation "requirements help to ensure that more efficient and cost-effective transmission solutions are implemented and that this occurs without undue delay." Order No. 1000-A at P 585; *see also id.* at P 592 (The absence of an *ex ante* regional cost allocation method causes "jurisdictional rates [to be] higher than they would otherwise be."). As this court recognized, "Order No. 1000 clearly linked cost causation, the elimination or reduction of free ridership, just and reasonable rates, and more efficient transmission planning and development." *El Paso Elec. I*, 832 F.3d at 505, n. 10; *see also Pub. Serv. Elec. & Gas Co. v. FERC*, 989 F.3d 10, 14 (D.C. Cir. 2021) (The promulgation of Order No. 1000 "to foster the *efficient* development of the transmission grid" was "[c]onsistent with the cost-causation principle." (emphasis added)).

Neither of the statutory mandates served by the cost-causation principle can be sacrificed for the other or for some separate policy interest. *See Lincoln v. Vigil*, 508 U.S. 182, 193, 113 S. Ct. 2024, 2032 (1993) ("Of course, an agency is not free simply to disregard statutory responsibilities . . . ."). To be sure, FERC may "emphasize other, competing policies and approve measures that do not *best match* cost responsibility and causation." *Carnegie Nat'l Gas*, 968 F.2d at 1294 (emphasis added). Additionally, FERC need not "allocate costs with exacting precision" or according to "a particular formula." *Old Dominion*, 898 F.3d at 1260. But the agency may never approve unjust and unreasonable rates by allocating

costs to those who reap little to no benefit, *see Ill. Com. Comm'n*, 576 F.3d at 476, nor may it choose not to allocate costs to "those who *cause* the costs to be incurred and reap the resulting benefits." *Nat'l Ass'n of Reg. Util. Comm'rs*, 475 F.3d at 1285 (emphasis added); *see also Consol. Edison Co. of NY v. FERC*, 45 F.4th 265, 282 (D.C. Cir. 2022) (per curiam) (vacating portion of FERC order that exempted "*de minimis*" beneficiaries from cost allocation).[6]

Thus, the distinction between extra-regional unintended beneficiaries and regional intended beneficiaries becomes critical. The former do not "cause" any costs to be incurred in a neighboring region. The latter do. As the Seventh Circuit put it in *Illinois Commerce Commission v. FERC*: "To the extent that a utility benefits from the costs of new facilities, it may be said to have 'caused' a part of those costs to be incurred, as *without the expectation* of its contributions the facilities might not have been built." 576 F.3d at 476 (emphasis added); *see also* Order No. 1000 at P 537 (quoting *Ill. Com. Comm'n*). In *South Carolina*, the petitioners would not have expected the contributions of the extra-regional beneficiaries when planning grid improvements. Although those beneficiaries may have enjoyed some free ridership in the technical sense, their ability to avoid binding cost allocation did not violate the cost-causation principle. In the WestConnect region, FERC's orders require that the jurisdictional utilities "specifically and intentionally" account for the needs of the non-jurisdictional utilities, which comprise half of the utilities in that region. And the non-jurisdictional

---

[6] The dissent chides our citation of *Nat'l. Ass'n of Reg. Util. Comm'rs, supra,* with that court's caveat that *customer* interconnections to a utility grid do not violate cost causation. 475 F.3d at 1285. This case is not about individual *customer* connections, but about transmission improvements that benefit non-contributing non-jurisdictional utilities. One cannot rationalize subsidization across transmission providers by reference to costs incurred by adding customers to an individual utility.

utilities may not only participate in planning but also vote on new projects. In contrast, in the era before Order No. 1000, the non-jurisdictional utilities regularly helped pay for regional transmission projects. Moreover, in the jurisdictional utilities' initial attempts to comply with Order No. 1000, which FERC rejected, the non-jurisdictional utilities would have continued to contribute funding via negotiated agreements for projects that benefited them.

When promulgating Order No. 1000, FERC anticipated the potential conundrum posed by regional non-jurisdictional utilities and provided a workable solution—which facilitates development while avoiding any cost-causation pitfalls. Non-jurisdictional utilities may elect "to become part of a transmission planning region by enrolling in that region." Order No. 1000-A at P 275. They would then be subject to binding cost allocation for future projects that benefit them. *Id.* But, importantly, non-jurisdictional utilities are not required to enroll. *Id.* at P 276. In that case, what must the jurisdictional utilities, which *are* required to enroll, do with the unenrolled, non-jurisdictional utilities? The answer: nothing. The regulation is clear: the "regional transmission planning process is *not required* to plan for the transmission needs of such a non-[jurisdictional] utility transmission provider that has not made the choice to join a transmission planning region." *Id.* (emphasis added). This is consistent with the two purposes of the cost-causation principle: (1) ensure just rates by preventing subsidization and (2) promote reasonable rates by incentivizing efficient and cost-effective transmission project planning. In the challenged orders for the WestConnect region, FERC turns this workable solution on its head, mandating that non-jurisdictional utilities need not enroll in the region, yet jurisdictional utilities *must plan* for their transmission needs.

In the name of policy balancing, FERC has prohibited the WestConnect region from imposing binding cost allocation on the non-

jurisdictional utilities although they will "cause," in part, the costs of new grid improvements. This scenario is entirely different from that encountered in *South Carolina*. No amount of emphasizing other competing interests permits FERC to sacrifice the foundational principle of cost-causation by refusing to allocate costs "to those who cause the costs to be incurred and who reap the resulting benefits." *Nat'l Ass'n of Reg. Util. Comm'rs*, 475 F.3d at 1285. Because FERC's orders are a "wholesale departure" from the cost-causation principle, *Old Dominion*, 898 F.3d at 1261, they cannot be considered "just and reasonable" and violate the Federal Power Act's cost-causation requirement as a matter of law.

## B.  FERC's Orders are Arbitrary and Capricious

But even assuming that FERC's challenged orders theoretically lie at the outer limits of the cost causation principle, the agency's explanation of how its orders work in this case is arbitrary and capricious. This court, in *El Paso Elec. I*, remanded for further explanation and fact finding, holding that "FERC's [orders] nowhere provide a reasoned explanation for why the non-jurisdictional utilities have incentive or obligation to participate in binding cost allocation when they can get many of the same benefits at the jurisdictional utilities' expense." *Id.* at 505. FERC now offers four principal arguments in support of its orders. We discuss each in turn.

### 1. *Fact Finding*

As an initial matter, FERC found it unnecessary "to order additional proceedings to investigate the participation of non-[jurisdictional] utility transmission providers in regional cost allocation in WestConnect." Order on Remand at P 29 n.62. This is because there are no new facts. Since 2015, the WestConnect planning process has not identified any regional transmission needs. Consequently, "there have been no opportunities for non-[jurisdictional] utility transmission providers to participate in cost

allocation for regional transmission projects." *Id.* Nonetheless, FERC purports to have found two facts on remand. First, while WestConnect non-jurisdictional utilities do not intend to enroll and subject themselves to binding cost allocation, FERC finds no evidence of any resulting harm. *Id.* at P 36. This makes no sense: how could there be evidence of harm where there have been no recent opportunities for non-jurisdictional utilities to opt out of cost allocation? This is like "finding" that exposure to sun is harmless where no one stepped outdoors.

More tellingly, FERC observes that all non-jurisdictional utility providers have elected to participate as coordinating transmission owners in order to have their transmission needs included in the regional transmission planning process. *Id.* at P 38. But the agency denies that this fact will instigate free-riding. FERC and the non-jurisdictional utilities insist there is a difference between choosing not to enroll in the region and retaining the ability to opt out of binding cost allocation on a project-by-project basis. In other words, the fact that non-jurisdictional utilities have refused to enroll does not mean that they will opt out of binding cost allocation in future projects. Maybe so; but the obvious inference is that non-jurisdictional utilities will opt out of cost allocation at least *some* of the time.[7] At the very least, these facts do not tend to show that impermissible free riding will not take place.

### 2. *Economic Theory and Expertise*

Because of the sparse factual record before it, FERC contends that it reasonably exercised its discretion to explain its actions based on economic

---

[7] That the non-public utilities will thus maintain the ability to free ride reinforces our alternative holding that FERC's orders fail under the FPA's cost allocation principle as a matter of law.

theory, its predictive judgment, and its expertise. Order Denying Rehearing at P 33; *see also FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1160 (2021) (holding that the FCC reasonably explained its actions, which constituted its "best estimate, based on the sparse record evidence"). The economic theory argument is puzzling, because FERC cites no theory pursuant to which a rational economic actor will elect to pay for some good or service that he can get for nothing. Similarly, the argument for agency expertise and judgment does not get FERC very far, for it merely parrots the well-established rule that agencies need not conduct their "own empirical or statistical studies before exercising" their discretion. *Prometheus Radio*, 141 S. Ct. at 1160. The overarching standard remains firmly in place: all agency action, even "predictive judgment[s] based on the evidence" available, must be "reasonable and reasonably explained." *Id.* at 1160. But here, the predictive judgment runs contrary to Order No. 1000 itself, which recognized and countered a predictive judgment of free riding by not requiring the jurisdictional utilities to plan and include non-enrolled non-jurisdictional ones. In other words, today's predictive judgment is at unexplained odds with that of yesterday. To provide an explanation that would have reconciled these positions was the purpose of remand, a principal part of the cost causation issue. Falling back on unexplained claims of agency expertise does not carry the remand burden.

### 3. *Benefit-to-Cost Threshold Ratio*

The only additional explanation FERC offers to show that non-jurisdictional utilities are actually likely to participate in binding cost allocation inheres in a generous benefit-to-cost threshold ratio every new transmission project must satisfy. Order on Remand at PP 40–43; Order Denying Rehearing at PP 24-25. FERC posits that a non-jurisdictional utility that will benefit from a project will likely pay its fair share of the costs, because if it opts out, the benefit-to-cost ratio will narrow, and the chance the

No. 18-60575

project fails to proceed increases.  It is thus in the interest of non-jurisdictional utilities that projects succeed.  This explanation is unreasonable.

What is more likely to happen if FERC's orders are implemented is gamesmanship predicated on the non-jurisdictional utilities' ability to reject cost allocation.  As EPE notes, because non-jurisdictional utilities participate in regional transmission planning on the same footing as jurisdictional utilities, the availability of a transparent cost-benefit ratio "will enable each non-[jurisdictional] utility to predict the likelihood that a given project will be built without its participation."  The non-jurisdictional utilities will have an incentive to exploit this information, bluffing their way to free ride on the backs of the jurisdictional utilities by gaming the cost-benefit calculations.  FERC's orders provide no comparable incentive for the jurisdictional utilities.

But there is an additional flaw in FERC's rationalization: it contradicts the reasoning of Order No. 1000.  When promulgating Order No. 1000, the agency understood that the potential for free ridership is "particularly high for projects that affect multiple utilities' transmission systems and therefore may have multiple beneficiaries."  Order No. 1000 at P 486.  The WestConnect region "is a heavily-integrated combination of [jurisdictional] and non-[jurisdictional] utility transmission providers," so it stands to reason that significant projects will benefit both jurisdictional and non-jurisdictional utilities.  Order on Remand at P 30.  The non-jurisdictional utilities, thus, have "an incentive to defer investment in the hopes that other beneficiaries will value the project enough to fund its development."  Order No. 1000 at P 486.  This kind of free ridership leads to unjust and unreasonable rates by delaying projects and shifting costs onto others.  *See id.* at PP 486, 512.  FERC's former solution to this problem, as articulated in Order No. 1000, was to require jurisdictional utilities to submit to binding cost allocation while

*not* requiring them to plan for the transmission needs of non-jurisdictional utilities. Order No. 1000-A at PP 276, 568. Now, in the name of policy balancing, FERC has flipped.[8] Crucially, it fails to explain how the presence of a benefit-to-cost threshold ratio not only neutralizes, but reverses the non-jurisdictional utilities' incentive to shift costs onto the jurisdictional utilities. In any event, even if the ratio creates some sort of impetus to pay, it is pure speculation to assume that the ratio will be so narrow in every project that the project will fail without the non-jurisdictional utilities' participation.[9]

Recognizing that a hypothesized incentive to pay does not guarantee that non-jurisdictional utilities will bear their share of costs, FERC maintains that if a non-jurisdictional utility opts out, so long as the threshold ratio is met, the project will satisfy the cost-causation principle because the benefits enjoyed by the jurisdictional utilities will remain "roughly commensurate" with the costs. As we explained above, the cost-causation principle does not test whether benefits exceed costs *simpliciter*, but whether benefits to

---

[8] The extent of FERC's turnabout from the reasoning of Order No. 1000, which these orders were intended to implement, is remarkable. FERC argues in this appeal that in regard to WestConnect, it was faced with two allegedly unpalatable alternatives for encouraging regional planning and cost allocation. Excluding non-public utilities would "fragment" regional planning, but requiring them to opt in or out of planning and associated costs would fail to prevent some free ridership. Thus, it chose the "middle course," authorizing the non-public utilities to get in on planning but avoid cost allocation. The "middle course," when analyzed, is a euphemism for mandating free ridership and incentivizing gamesmanship at the expense of planning. Maybe these consequences have played a role in the inability of WestConnect to move forward on any regional planning for nearly a decade following FERC's challenged orders.

[9] The dissent concludes by stating that "FERC sufficiently explained why Order No. 1000 appropriately balances those competing goals" (i.e., cost causation and other policy objectives). Respectfully, as articulated above, the compliance orders at issue here fundamentally conflict with the reasoning of Order No. 1000's prescription: that non-jurisdictional utilities' needs may *not* be taken account of by jurisdictional utilities in planning *unless* those utilities have agreed to pay their share of the costs. FERC fails to follow its own governing Order No. 1000 as well as the FPA.

particular utilities are *linked* to costs "caused" by those utilities. *See* Order No. 1000 at P 724 ("there must be a demonstrated link between the costs imposed through a cost allocation method and the benefits received by beneficiaries that must pay those costs"). This court has already stated that FERC's compliance orders cannot "satisfy its statutory mandate—except by ignoring the benefits the non-jurisdictional utilities would receive." *El Paso Elec. I*, 832 F.3d at 507 n.13. FERC's revised explanation continues to ignore the benefits it acknowledges could accrue to free-riding non-jurisdictional utilities. Thus, FERC's orders are unreasonable for peddling the benefit-to-cost threshold ratio as a cure-all for the free ridership malady its new scheme creates.

### 4. *"Wait-and-See" Approach*

As a final gesture of reasonableness, FERC assures the court that it will intervene in the WestConnect region if things get out of hand or once "more empirical evidence becomes available." Order on Remand at P 36. EPE and the Public Utilities respond that by then it will be too late. Under the "filed-rate doctrine," "once a rate is in place with ostensibly full legal effect and is not made provisional, it can then be changed only prospectively." *Tex. E. Transmission Corp. v. FERC*, 102 F.3d 174, 183 (5th Cir. 1996). Thus, the injuries suffered as a result of any unjust and unreasonable rate will be irreparable. Further, agencies cannot play the "administrative law shell-game" of offering "future rulemaking as a response to a claim of agency illegality." *Ameren Servs. Co. v. FERC*, 880 F.3d 571, 584 (D.C. Cir. 2018) (citing *Am. Tel. & Tel. Co. v. FCC*, 978 F.2d 727, 732 (D.C. Cir. 1992)). A "wait-and-see suggestion confuses adjudication—which is retroactive . . .—with rulemaking, which is of only future effect." *Id.* This court ordered FERC to provide adequate reasons in support of its actions. It is unreasonable for FERC now to tell the court to stay tuned.

No. 18-60575

## III. Conclusion

For the foregoing reasons, we conclude that FERC's orders implementing Order No. 1000 for the WestConnect region are incompatible with the FPA's mandate for just and reasonable rates and with Order No. 1000's application of the cost causation principle; and in addition, FERC's attempt to provide a reasoned explanation for its abnegation of cost causation on remand is inadequate and unreasonable. Therefore, we GRANT the petition for review and REVERSE the orders.

No. 18-60575

Leslie H. Southwick, *Circuit Judge*, dissenting:

In 2016, we remanded three agency orders to the Federal Energy Regulatory Commission ("Commission" or "FERC"). Those orders had modified and approved a regional electric transmission planning and cost allocation program for WestConnect, a voluntary association of western electric utilities. *El Paso Elec. Co. v. FERC*, 832 F.3d 495 (5th Cir. 2016). We found that FERC's orders did not fully explain why the agency would permit the non-jurisdictional members of WestConnect to benefit from new high-voltage transmission facilities without requiring them to share in the costs of those facilities. *Id.* at 504–08.

In that opinion, we concluded FERC had not explained how rates could be just and reasonable if the agency orders "effectively assur[ed]" that only the jurisdictional utilities would bear the costs of transmission development in the region. *Id.* at 505. We held that FERC had not articulated why the non-jurisdictional utilities would participate in binding project cost allocation when they could opt out and "get many of the same benefits at the jurisdictional utilities' expense." *Id.* We remanded the issue of the non-jurisdictional utilities' role in transmission planning and cost allocation for FERC to offer "further explanation and fact finding consistent with this opinion." *Id.* at 510–11. We did not provide more specific instructions.

On remand, in the orders now on review, FERC reaffirmed its prior determinations and elaborated on its prior findings. *See* 161 FERC ¶ 61,188 (2017) ("Order on Remand"); 163 FERC ¶ 61,204 (2018) ("Order Denying Rehearing"). I agree with FERC and the Respondent-Intervenors that FERC's fact findings on remand suffice to support that its compliance orders are structured to minimize any potential free ridership by the non-jurisdictional utilities and do not violate the cost-causation principle.

No. 18-60575

Further, I find an adequate explanation of why the public utilities would not bear the costs for the region in transmission planning.

El Paso argues that FERC's conclusions on remand are not supported by substantial evidence and contends that it is "sheer speculation" that the non-jurisdictional utilities would voluntarily accept binding cost allocation. El Paso dismisses FERC's assertion in the Order on Remand that the Compliance Orders protect against free ridership by implementing the 1.25x benefit-cost ratio, claiming there is "no evidentiary basis in the record to support FERC's assumptions, only guesswork." El Paso argues, with aid of a numerical example, that a non-jurisdictional utility can decline cost allocation and still reap the benefits of a hypothetical WestConnect project.[1] FERC and the Respondent-Intervenors counter that FERC's determinations "reasonably relied on economic theory, the Commission's reasonable predictive judgment, and its expertise."

A reviewing court's duty under both the Federal Power Act and the Administrative Procedure Act is to ascertain whether the agency has offered a reasonable explanation for its actions, not whether its "decision is the best one possible." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016). "[N]owhere is this more true than in a technical area like electricity rate design." *Id.* "Indeed, the agency's decision need not be ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to the relevant facts contained in the record." *State of La. Ex rel. Guste v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). In such a case, the court

---

[1] El Paso also provided a hypothetical in its Rehearing Request. Order Denying Rehearing at ¶ 23 & n.69. FERC did not find the hypothetical "compelling." *Id.* at ¶ 23. It found that the hypothetical presented was highly unlikely because the only reason such a project would be able to move forward was if the benefits to the paying utilities were still significant enough to satisfy the 1.25x cost-benefit ratio. *Id.* at ¶ 24.

must uphold the decision even if it is "of less than ideal clarity if the agency's path may reasonably be discerned." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto Ins. Co.*, 463 U.S. 29, 43 (1983) (quotation marks and citation omitted).

Importantly for the case before us, "an agency's predictive judgment regarding a matter within its sphere of expertise is entitled to particularly deferential review." *Fresno Mobile Radio, Inc. v. FCC*, 165 F.3d 965, 971 (D.C. Cir. 1999) (quotation marks and citation omitted). An agency is "not required to support its analysis with hard data where it reasonably relied on difficult-to-quantify, intangible benefits." *Huawei Technologies USA v. FCC*, 2 F.4th 421, 454 (5th Cir. 2021). A reviewing court is accordingly "limited to considering whether the [agency] made a reasonable predictive judgment based on the evidence it had." *Id.* at 545 (quotation marks and citation omitted). This means that a court "cannot demand the agency perform its own empirical or statistical studies, especially when it relies on unquantifiable benefits." *Id.* (quotation marks and citation omitted).

As mentioned earlier, our 2016 *El Paso* decision returned the matter to FERC because it had not articulated why the non-jurisdictional utilities would participate in binding project cost allocation when they could opt out and "get many of the same benefits at the jurisdictional utilities' expense." *El Paso*, 832 F.3d at 505. In its later Order Denying Rehearing, FERC acknowledged that its explanation in the Third Compliance Order "stated, without further elaboration, that the transmission planning process removes the benefits of non-public [utilities] that do not accept cost allocation, and therefore the resulting cost allocation determinations are commensurate with the estimated benefits considered." Order Denying Rehearing at ¶ 15. It *then* explained how "[t]he Order on Remand, in contrast, provided a more detailed explanation of the reevaluation process, and, unlike the Third Compliance Order, explained that a crucial part of the reevaluation process

No. 18-60575

is that transmission projects may fail to meet the cost-benefit threshold upon reevaluation if non-public [utilities] do not agree to cost allocation (such that the projects will no longer be eligible for regional cost allocation and are less likely to be ultimately developed)." *Id.*

The Order on Remand explains how and why the 1.25x benefit-cost ratio requirement will discourage free ridership by incentivizing regional cost allocation.[2] *See* Order on Remand at ¶¶ 40–52. FERC found that if a substantial number of non-jurisdictional utilities — hoping for a free ride — chose to decline cost allocation for a project that benefitted them, there is a good chance the project would then fail the required 1.25x benefit-cost ratio and not proceed. *Id.* at ¶ 47. As a result, FERC concluded that free riding could theoretically only occur for a "limited subset of transmission projects." *Id.* at ¶ 39. Because the non-public utilities are subject to the same reliability regulations as public utilities, FERC found that they therefore "have an incentive to accept regional cost allocation for reliability transmission projects because their transmission facilities must adhere to NERC Reliability Standards." *Id.* at ¶ 48. In other words, because of the interconnectedness of the region, if the non-public utilities consistently refused to participate in cost allocation, their *own* ability to build transmission

---

[2] "Specifically, for each transmission project proposed for selection in the regional transmission plan for purposes of cost allocation, the WestConnect Planning Management Committee (the Committee) performs cost-benefit analysis to determine whether the transmission project is eligible for regional cost allocation." Order on Remand at ¶ 40. If a non-public utility declines cost allocation, WestConnect re-runs the cost-benefit analysis, removing the benefits the declining utility would have received. *Id.* at ¶ 41. This means there would be fewer benefits in a re-run, and so the ratio of project benefits to costs would decrease. *See id.* at ¶ 42. The project would not proceed for remaining participants unless the estimated benefits to those utilities still exceeded their allocated costs by 25 percent (*i.e.*, the 1.25x benefit-cost ratio). *Id.* at ¶ 46.

projects that require the public utilities' cooperation would suffer too. *Id.* at ¶ 30, **JA.1285**.

In that vein, the Order on Remand discusses how, in this region, the service territories of the public utilities are often "physically separated" by the non-public utilities, and there are few interconnections between only public utilities. *Id.* As a result, the WestConnect region is "uniquely integrated" between public and non-public utilities. *Id.* at ¶ 31. We wrote in our 2016 opinion that the region has historically depended on "voluntary coordination" in planning projects in the region that resulted in "shared costs and many jointly owned projects." *El Paso*, 832 F.3d at 501. FERC relied upon this "history of significant joint transmission planning" between the non-public and public utilities in its decision. Order on Remand at ¶ 30.

El Paso contends that the historic cooperation between the utilities is irrelevant because, in the past, no one had been *required* to pay for projects. Thus, cooperation was essential. It further asserts that this explanation regarding the benefit-cost ratio is unsatisfying because the record contains "no evidentiary basis" or "empirical evidence" to support FERC's assumptions of its effectiveness, "only guesswork." To some degree, this is true. FERC stated in its orders on remand that there have been no WestConnect projects to date, so there is no direct, empirical evidence to support or to contradict El Paso's claim that non-public utilities could decline cost allocation even if presented with a project that benefitted them. Order Denying Rehearing at ¶ 33 & n.92; Order on Remand at ¶ 29 & n.62.

I disagree with El Paso's assertion, though, that this uncertainty is fatal to FERC's explanation on remand. "Agencies do not need to conduct experiments in order to rely on the prediction that an unsupported stone will fall; nor need they do so for predictions that competition will normally lead to lower prices." *Associated Gas Distribs. v. FERC*, 824 F.2d 981, 1008-09

(D.C. Cir. 1987). When no empirical evidence is available, agencies are permitted to make "reasonable predictions rooted in basic economic principles." *South Carolina Pub. Serv. Auth. v. FERC*, 762 F.3d 41, 76 (D.C. Cir. 2014) ("*South Carolina*"). Moreover, FERC may make findings based on predictions derived from economic research and theory, as long as it explains and applies those principles in a "reasonable manner." *Sacramento Mun. Util. Dist. v. FERC*, 616 F.3d 520, 531 (D.C. Cir. 2010).

FERC has provided a logical predictive economic explanation that non-public utilities will typically be incentivized to ensure transmission projects are advanced when benefits to them exceed the costs. Order Denying Rehearing at ¶ 32-33, citing Order on Remand at ¶ 39-49. FERC has explained that even if non-public utilities occasionally refuse cost allocation, public utilities cannot be forced to pay for projects that do not provide them net benefits. Order on Remand at ¶ 42. Finally, FERC has also explained that even if non-public utilities refuse cost allocation, the project will likely fail because it cannot satisfy the benefit-cost ratio. FERC posits that non-public utilities, therefore, will be incentivized to accept the sharing of costs most of the time because they, too, need these projects. *Id.* at ¶ 47–48. FERC is allowed to act in appropriate circumstance on such predictive assumptions. Its prediction could well be wrong, but our contrary predictions should not be injected into the analysis.

Most of the foregoing concerns the reasonableness of FERC's factual determinations. To the extent there is an argument that FERC's orders fail as a matter of law, that possibility needs to be addressed.

El Paso's chief remaining argument is that FERC's explanation on remand fails because, even assuming its 1.25x benefit-cost ratio is successful in deterring some free ridership, it will not eliminate it. According to El Paso, FERC's Order would violate the cost-causation principle as a matter of law

No. 18-60575

because it would permit "certain utilities to push their share of a regional transmission project's costs onto other utilities," which is "not just and reasonable as a matter of law."

This assessment of the cost-causation principle is unconvincing. FERC reasonably explained why it disagreed with those arguments. The cost-causation principle stems from the Federal Power Act's ("FPA") requirement of "just and reasonable rates." 16 U.S.C. § 824d(a)–(b).[3] When it comes to cost allocation for transmission enhancements, FERC must have "an articulable and plausible reason" to believe that the benefits of a new project "are at least roughly commensurate" with the costs assessed. *Illinois Comm. Comm'n. v. FERC*, 576 F.3d 470, 477 (7th Cir. 2009). The agency does not have to "calculate benefits to the last penny." *Id*.

We remanded this matter in 2016 for "further explanation and fact finding consistent with this opinion." *El Paso*, 832 F.3d at 510–11. Were reallocation of costs and benefits under Order No. 1000 a *per se* violation of the cost causation principle as a matter of law, no explanation from FERC could have sufficed. We recognized that "[i]t is [] certainly within FERC's

---

[3] We explained the origin story this way:

> In the Federal Power Act ("FPA"), Congress gave FERC jurisdiction "over all facilities" for "the transmission of electric energy in interstate commerce and . . . the sale of electric energy at wholesale in interstate commerce." 16 U.S.C. § 824(b)(1). Section 205 of the FPA prohibited "unreasonable rates and undue discrimination 'with respect to any transmission or sale subject to the jurisdiction of the Commission,'" *New York v. FERC*, 535 U.S. 1, 7, 122 S.Ct. 1012, 152 L.Ed.2d 47 (2002) (quoting 16 U.S.C. § 824d(a)–(b)), and Section 206 of the FPA gave FERC's predecessor "the power to correct such unlawful practices," *id.* (citing 16 U.S.C. § 824e(a)), including on its own motion, *S.C. Pub. Serv. Auth. v. FERC (South Carolina)*, 762 F.3d 41, 49 (D.C. Cir. 2014).

*El Paso*, 832 F.3d at 499.

discretion to balance competing objectives, and FERC's regulations need only roughly correlate costs to benefits." *Id.* at 505. That is still true today.

The opinons cited as support by El Paso and the Public Utilities to support the idea that FERC's orders fail as a matter of law are also unconvincing. For example, they argue that a utility who "'cause[s]' a portion of the costs for that project, but will not bear any costs," violates the cost-causation principle as a matter of law. They cite a D.C. Circuit opinion that summarized the petitioners' argument as "contend[ing] that the [] rule violates the basic 'cost causation' principle, under which costs are to be allocated to those who cause the costs to be incurred and reap the resulting benefits." *Nat'l Ass'n of Reg. Util. Com'rs v. FERC*, 475 F.3d 1277, 1285 (D.C. Cir. 2007). In fact, though, the D.C. Circuit rejected the petitioners' argument. *Id*. The court reasoned that "FERC has long taken the view that customer 'but-for' causation isn't dispositive of this issue," and that "[e]ven if a customer can be said to have caused the addition of a grid facility, the addition represents a system expansion used by and benefitting *all* users due to the integrated nature of the grid." *Id.* (quotation marks and citation omitted) (emphasis in original). That opinion supports that FERC can consider system-wide benefits as a competing policy goal, even when potential free riding may occur.

We are also urged to consider a Seventh Circuit opinion that rejected FERC's requirement that a utility pay for facilities when "the likely benefit" to the utility was "zero," and, in addition, "[n]othing in [FERC's] opinions enable[d] an answer to [the] question" of whether there was "enough of a benefit to justify the costs that FERC wants shifted to those utilities." *See Illinois Com. Comm'n*, 576 F.3d at 477. That is not the problem here. A calculable benefit for the public utilities is required under these Orders, namely, a 1.25x benefit-cost ratio per project, which applies before and after cost reallocation for the public utilities. Order on Remand at ¶¶ 42, 50, JA

1293, 1296–97. If all the non-public utilities refuse cost allocation for a particular project, FERC predicted that the project was unlikely to be built; so the non-public utilities do have an incentive to contribute to costs. The "likely benefit" is, by definition, *not* "zero."

Finally, I disagree that another D.C. Circuit opinion stands for the proposition that any potential for intra-regional free ridership is unequivocally violative of the cost-causation principle. *See South Carolina*, 762 F.3d at 87–88. The Public Utilities argue that the limited free ridership the court permitted in *South Carolina* was solely for "unintended beneficiaries outside of a region," and therefore not comparable to free ridership of the *known* project beneficiaries *within* the WestConnect region at issue here.

The potential for free-riding beneficiaries may have been extra-regional in *South Carolina*, but there is no binding precedent that would mandate a different result solely because the potential for occasional free-riding beneficiaries is intra-regional in this case. When the D.C. Circuit rejected the challenges to the cost allocation reforms in *South Carolina*, the court was clear to "recognize that feasibility concerns play a role in approving rates, such that [FERC] is not bound to reject any rate mechanism that tracks the cost-causation principle less than perfectly." *Id.* at 88 (quotation marks and citation omitted). The court confirmed that FERC "may rationally emphasize other, competing policies and approve measures that *do not best match cost responsibility and causation.*" *Id.* (quoting *Carnegie Nat. Gas Co. v. FERC*, 969 F.2d 1291, 1293–94 (D.C. Cir. 1992)) (emphasis added). Moreover, "nothing requires the Commission to ensure full or perfect cost causation." *Id.*

The D.C. Circuit explained that we grant FERC this latitude to "balance[] . . . competing goals" because of the "deferential review we

accord in rate-related matters." *Id.* FERC's solution may not be the one that we think the most fair, or even the most effective. Nevertheless, it is not our role to "ask whether a regulatory decision is the best one possible or even whether it is better than the alternatives." *Elec. Power Supply Ass'n*, 577 U.S. at 292. Instead, reviewing courts "afford great deference to the Commission in its rate decisions," and do "not substitute [their] own judgment for that of the Commission. *Id.* (quotation marks and citation omitted). This is partly because "issues of rate design are fairly technical and, insofar as they are not technical, involve policy judgments that lie at the core of the regulatory mission." *La. Pub. Serv. Comm'n v. FERC*, 771 F.3d 903, 910 (5th Cir. 2014) (quotation marks and citation omitted).

In summary, we know that some free ridership may be tolerated. Order No. 1000 acknowledges that some free ridership is "inherent in transmission services, given the nature of power flows over an interconnected transmission system." Order No. 1000 at ¶ 10, 136 FERC 61,051, 76 Fed reg. 49,842 (2011). FERC balanced policy goals with a cost allocation scheme that considered the net benefits to the public utilities of building new facilities with the unique integration of public and non-public utilities in the WestConnect region. *See* Order on Remand at ¶ 30.

I would hold that FERC has sufficiently explained why Order No. 1000 appropriately balances those competing goals and that it has demonstrated how the costs for transmission planning would be roughly commensurate with the benefits for the utilities in the region. I respectfully dissent from the opinion of my colleagues.